SCOTT+SCOTT LLP
ARTHUR L. SHINGLER III (181719)
MARY K. BLASY (211262)
LUIS E. LORENZANA (248162)
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)
ashingler@scott-scott.com
mblasy@scott-scott.com
– and –
DAVID R. SCOTT
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)
drscott@scott-scott.com

[Additional Counsel on Signature Page]

Counsel for Plaintiff
Saginaw Police & Fire Pension Fund

**FILED**

OCT 19 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAGINAW POLICE & FIRE PENSION FUND, | No. |
| Plaintiffs, | **CV 10-04720 PVT** |
| vs. | |
| MARC L. ANDREESSEN, LAWRENCE T. BABBIO, SARI M. BALDAUF, RAJIV L. GUPTA, JOHN H. HAMMERGREN, MARK V. HURD, JOEL Z. HYATT, JOHN R. JOYCE, ROBERT L. RYAN, LUCILLE S. SALHANY, and G. KENNEDY THOMPSON, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT  JURY TRIAL DEMANDED |
| Defendants, | |
| – and – | |
| HEWLETT-PACKARD COMPANY, a Delaware corporation, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................2

JURISDICTION AND VENUE ...................................................................................6

PARTIES ....................................................................................................................6

    PLAINTIFF...........................................................................................................6

    NOMINAL DEFENDANT.....................................................................................7

    THE DIRECTOR DEFENDANTS.........................................................................7

    DEFENDANT MARK HURD ..............................................................................12

THE DIRECTOR DEFENDANTS' RESPONSIBILITIES AND DUTIES .................14

THE KICKBACK AND FALSE CLAIMS ACT SCHEME.........................................18

    THE FALSE CLAIMS ACT ................................................................................18

    THE ANTI-KICKBACK ACT .............................................................................18

    HP'S ILLEGAL MARKETING ACTIVITIES ....................................................19

    THE FOREIGN CORRUPT PRACTICES INVESTIGATIONS ..........................27

DEMAND IS EXCUSED.............................................................................................29

COUNT I .....................................................................................................................31

    BREACH OF FIDUCIARY DUTY FOR CAUSING THE COMPANY TO
    ENGAGE IN UNLAWFUL CONDUCT AND/OR CONSCIOUSLY
    DISREGARDING WIDESPREAD VIOLATIONS OF LAW ...........................31

COUNT II ....................................................................................................................32

BREACH OF FIDUCIARY DUTY .............................................................................32

COUNT III...................................................................................................................32

    UNJUST ENRICHMENT ....................................................................................32

PRAYER FOR RELIEF ..............................................................................................33

JURY DEMAND .........................................................................................................33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                           i

*"We want to be a company known for its ethical leadership – a company where employees are proud to work, a company with which customers, business partners, and suppliers want to do business."* – Hewlett-Packard Standards of Business Conduct

## NATURE OF THE ACTION

1.     This is a derivative action brought by Plaintiff, Saginaw Police & Fire Pension Fund ("Saginaw"), a shareholder in Hewlett-Packard Company ("HP" or the "Company"), against the current and former HP officers and directors who knowingly allowed and rewarded HP's violation of the federal Anti-Kickback Act of 1986 ("AKA"), False Claims Act ("FCA"), Truth In Negotiations Act ("TINA"), and Foreign Corrupt Practices Act ("FCPA") for a two-and-half-year period running from June 8, 2007 through December 31, 2009.

2.     The wrongdoing giving rise to this action occurred in connection with HP's sales to the U.S. Government.

3.     Because of the large amounts of taxpayer money disbursed through government contracts and the potential for corruption, commercial transactions with the U.S. Government are regulated by the AKA, TINA and FCA.  In particular, the Anti-Kickback Act prohibits individuals from making a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment. 41 U.S.C. §53. The False Claims Act prohibits individuals from knowingly presenting or causing to be presented to the U.S. Government false or fraudulent claims for payment.  31 U.S.C. §3729.  The Truth in Negotiations Act requires parties contracting with the U.S. Government to provide accurate, complete and current pricing data.  10 U.S.C. §2306a.  These statutes protect the U.S. Government and taxpayers from companies seeking to pad their bottom line by using unscrupulous tactics to obtain overly favorable government contracts.

4.     From January 1, 2002 to December 31, 2009 – eight years – HP extensively violated the AKA by paying kickbacks to other government contractors and vendors in order to influence the award of contracts and/or obtain favorable treatment in the federal procurement. Under this kickback scheme, which was sometimes referred to as "Alliances," "Alliance Teams" or "Alliance Partners," HP provided so-called "influencer fees" and other financial benefits to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                               2

1  "Alliance Partners," including Accenture, BearingPoint, Cap Gemini Ernst & Young, Electronic

2  Data Systems, GTSI Corp., Northrop Grumman, Science Application International Corp., and

3  Unisys.

4       5.     Some of the companies that HP paid kickbacks to were "Systems Integration

5  Consultants," which were outside consultants hired by the U.S. Government to provide it with

6  independent, objective advice regarding how to optimally design and construct its information

7  technology systems.   As such, these Systems Integration Consultants were well-situated to

8  channel additional government business to HP.

9       6.     These actions also violated the FCA because the "influencer fees" that HP

10  secretly paid to "Alliance Partners" in exchange for favorable treatment tainted the resulting

11  contract between HP and the U.S. Government.   For this and other reasons, HP's government

12  contracts were defectively priced and claims made for payments on HP's U.S. Government

13  contracts violated the FCA.

14       7.     HP's management, including its directors and CEO, purported to adhere to a

15  rigorous code of ethics, the Standards of Business Conduct ("SBC"), that forbade HP employees

16  from committing illegal acts and contained the admonition "Do not offer or provide bribes or

17  kickbacks to win business or influence a business decision – anywhere on anything."

18       8.     But in direct contradiction of this code of ethics as well as Defendants' fiduciary

19  duty to the Company, HP's then-CEO, Mark Hurd ("Hurd") and HP's directors consciously

20  condoned HP's illegal and unethical marketing practices.   Documents filed in the underlying

21  FCA case against HP show that the U.S. Government brought the illegal marketing activities to

22  HP's attention in late 2006/early 2007 and filed a complaint against HP alleging FCA and AKA

23  violations the Company on *April 12, 2007*.   Yet despite being unequivocally told that HP's

24  marketing practices violated federal law, Defendants allowed these practices to continue until

25  *December 31, 2009*.

26       9.     According to recitals in the Settlement Agreement between the U.S. Department

27  of Justice ("DOJ") and HP, dated August 30, 2010 (Exhibit A), in which HP agreed to pay

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          3

1   $55 million in fines to settle the civil claims against it, the illegal marketing practices continued

2   to occur even after the DOJ advised HP of the evidence of FCA violations gathered by two

3   private *qui tam* plaintiffs (the "Relators") and unsealed their FCA complaints against HP.  In late

4   2006/early 2007, DOJ officers met with HP about the wrongdoing alleged by the Relators, and

5   which, by that time, had been thoroughly investigated and confirmed by the DOJ.  Following this

6   meeting, HP purported to conduct an "internal investigation" of the government's charges, and

7   disclosed some, but not all, of the Company's defective pricing.  Thus, HP and the Board had

8   actual knowledge of HP's illegal conduct, yet permitted it to continue unabated.  Among other

9   things, the Relators' complaint disclosed that then-HP CEO Hurd had been actively involved

10   from the very initiation of the "Alliance Partners" kickback scheme when he was employed as a

11   marketing officer at the Teradata division of NCR, Corp. ("NCR") (where one of the Relators

12   had also been employed).  Many of the detailed allegations in the Relators' complaint, and their

13   supporting documents, were provided by one of the Relators who had worked at NCR during

14   Hurd's tenure, and later worked at the Systems Integration Consultant Accenture LLP, that had

15   "Alliance" kickback arrangements with both NCR and HP.

16        10.    Furthermore, on September 9, 2010, in the same quarterly report announcing the

17   settlement with the DOJ of the civil kickback and FCA charges, HP also announced the

18   pendency of a federal investigation by the DOJ and the Securities and Exchange Commission

19   ("SEC") against HP involving payments to foreign officials in violation of the FCPA.  According

20   to the SEC report, the United States Government had joined into the investigation begun by

21   German and Russian authorities regarding bribes by HP employees in those countries, noting that

22   the German prosecutors recently requested information on several non-public sector transactions

23   entered into by HP and its subsidiaries on or around 2006 involving one or more persons also

24   involved in the contract.

25        11.    The pattern of illegal marketing activity by HP and its co-conspirators has

26   resulted in a series of court orders sustaining the FCA claims and civil settlements, including the

27   payment of $55 million by HP in civil fines.  Notably, the August 30, 2010 settlement agreement

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          4

1  filed in the FCA case against HP, specifically reserves **and does not settle or release** claims

2  against **any** individual (*i.e.*, Hurd and HP's Board members have not been released from civil

3  liability) and did not release potential claims for criminal liability against HP or any individual.

4  Besides causing HP, and its shareholders, to fund the $55 million in civil fines and extensive

5  costs of the government and internal investigations, and exposing HP to criminal sanctions, the

6  misconduct described in the FCA complaints and associated evidence, has put the Company at

7  risk of having its U.S. Government contracts rescinded and of a suspension and debarment from

8  contracting with the government in the future.  For the period of 2007 through 2009 alone, HP

9  had sales to U.S. agencies of more than $880 million.  Defendants' knowing abdication of their

10  fiduciary duties has already greatly harmed HP and poses a threat of far greater harm if

11  Defendants continue to condone HP's illegal marketing activities.

12        12.   Despite being confronted with allegations of Hurd's active participation in the

13  Alliance Partners kickback scheme and purporting to institute its own internal investigation, for

14  three years, the Board rewarded Hurd with generous incentive compensation that outpaced HP's

15  peers and which, for 2009, was reported to be the fourth highest paid to any corporate executive

16  in the United States.  For this same period, in recognition of their own purported oversight of

17  HP's exceptional financial performance, HP's Directors generously rewarded themselves with

18  hundreds of thousands of dollars each.  Although HP may "claw back" incentive payments to its

19  senior executives when financial statements are restated, there is apparently no financial

20  disincentive to HP's executives who boost Company earnings through kickbacks and bribes, or

21  for Directors who condone such wrongdoing.

22        13.   For the reasons stated herein, it is painfully obvious that HP's Board has not and

23  will not act as a disinterested and independent check on illegal corporate action, and that to

24  remedy this misconduct, HP's shareholders need to bring suit.  Accordingly, Saginaw brings this

25  suit seeking recovery of the FCA fines and other related expenses, repayment of the salaries paid

26  to Defendants for 2007-2009, and the implementation of effective corporate governance changes

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          5

1   sufficient to counteract the enormous financial incentives to corporate officers to increase their

2   pay by boosting sales through kickbacks and bribes.

3         14.    Demand is excused in this action for several reasons.   First, the Director

4   Defendants' decisions to knowingly allow HP to engage in illegal activities and to reward Hurd

5   with massive compensation are not protected by the business judgment rule.   Second, all of the

6   Director Defendants were on the Board for at least part of the 2007-2009 period when the

7   Director Defendants had knowledge of the illegal marketing activities at HP.   These Director

8   Defendants cannot objectively consider the decision to prosecute derivative claims against them

9   because they themselves are potentially liable for the underlying breaches of the FCA.   Finally,

10   the Director Defendants cannot objectively consider the breach of fiduciary duty claims against

11   them because their actions have exposed them to a substantial likelihood of liability for these

12   claims.

13   **JURISDICTION AND VENUE**

14         15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in

15   that the Plaintiff and Defendants are citizens of different states and the matter in controversy

16   exceeds $75,000.00, exclusive of interests and costs.   This action is not a collusive one to confer

17   jurisdiction on a court of the United States which it would not otherwise have.

18         16.    Venue is proper in this district because a substantial portion of the transactions

19   and wrongs complained of herein, including the Defendants' primary participation in the

20   wrongful acts detailed herein, occurred in this district.

21   **PARTIES**

22   **Plaintiff**

23         17.    Plaintiff Saginaw is an unincorporated employee retirement benefits trust with a

24   principal place of business at Saginaw, Michigan.   Saginaw is a shareholder of HP and has

25   continuously been a shareholder of HP from November 2, 2007 through the present.   All of the

26   trustees of Saginaw reside in Michigan.

27

28   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT             6

**Nominal Defendant**

18.    Nominal Defendant HP is a corporation duly organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 3000 Hanover Street, Palo Alto, California 94304. HP is a global provider of products, technologies, software, solutions and services to individual consumers and to businesses. Its products include multi-vendor customer services, including infrastructure technology and business process outsourcing, technology support and maintenance, application development and support services, and consulting and integration services; enterprise information technology infrastructure, including enterprise storage and server technology, networking products and resources, and software that optimized business technology investments; personal computing and other access devices; and imaging and printing-related products and services. The Company is publicly owned, and its shares are traded on the New York Stock Exchange under the symbol "HPQ."

**The Director Defendants**

19.    Defendant Marc L. Andreessen ("Andreessen") is and has been an HP director since September 17, 2009. According to HP's website, Andreessen currently serves as Chairperson for the Company's Technology Committee and as member of the Public Policy Committee. Andreessen is a citizen of California. In 2009, Andreessen received $32,002 in compensation for serving as an HP director.

20.    Defendant Lawrence T. Babbio, Jr. ("Babbio") has served as a director of HP since 2002. According to HP's website, Babbio currently serves as Chairperson of the Human Resources ("HR") and Compensation Committee and as a member of the Finance and Investment Committee and the Nominating Committee and the Governance Committee. Since 2007, Babbio has been a senior adviser to Warburg Pincus, a private equity firm. Babbio also serves as chairman of the Board of Trustees of Stevens Institute of Technology in Hoboken, New Jersey. On September 17, 2009, then-NJ Attorney General, Anne Milgram, announced charges against Babbio and Stevens Institute of Technology president, Harold J. Raveché. According to the state's 16-count lawsuit, Stevens' leaders kept several trustees in the dark about the school's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT       7

financial condition.  The Babbio/Raveché administration allegedly spent the school's money at greater rates than the board approved, scavenging restricted assets, excessive loans and gifts to the school earmarked for other purposes.  The lawsuit alleged that Babbio and Raveché "regularly misrepresented" the finances of the school and caused the endowment to fall by $42 million dollars from $157 million in 2000 to $115 million in 2009.  The lawsuit also disclosed that Raveché received below-market loans from the school, at least some of which were improperly forgiven.  The complaint also raises questions about Raveché's $1+ million salary, which was greater than the salaries paid to the presidents of Massachusetts Institute of Technology, Harvard or Princeton.  Babbio is a citizen of New York.  In 2007, Babbio received $247,673 in compensation for serving as an HP director.  In 2008, Babbio received $272,340 in compensation and in 2009, Babbio received $305,573.

21.  Defendant Sari M. Baldauf ("Baldauf") is and has been a director of HP since 2006.  According to HP's website, Baldauf currently serves as a member of the Audit Committee, the Nominating and Governance Committee, and the Technology Committee.  Baldauf is a citizen of the Netherlands.  In 2007, Baldauf received $221,564 in compensation for serving as an HP director.  In 2008, Baldauf received $265,836 in compensation and in 2009, Baldauf received $330,698.

22.  Defendant Rajiv L. Gupta ("Gupta") is and has been a director of HP since January 14, 2009.  According to HP's website, Gupta is a member of the HR and Compensation Committee, the Public Policy Committee, and the Technology Committee.  Gupta is a citizen of Pennsylvania.  In 2009, Gupta received $206,407 in compensation for serving as an HP director.

23.  Defendant John H. Hammergren ("Hammergren") is and has been a director of HP since 2005.  According to HP's website, Hammergren is currently Chairperson of the Finance and Investment Committee and a member of the HR and Compensation Committee.  Hammergren is a citizen of California.  In 2007, Hammergren received $213,825 in compensation for serving as an HP director.  In 2008, Hammergren received $271,974 in compensation and in 2009, Hammergren received $339,575.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                8

24.     Defendant Joel Z. Hyatt ("Hyatt") is and has been a director of HP since 2007. According to HP's website, Hyatt is currently Chairperson of the Public Policy Committee and a member of the Finance and Investment Committee and the HR and Compensation Committee. Hyatt is a citizen of California.  In 2007, Hyatt received $63,773 in compensation for serving as an HP director.  In 2008, Hyatt received $269,164 in compensation and in 2009, Hyatt received $297,755.

25.     Defendant John R. Joyce ("Joyce") is and has been a director of HP since 2007. According to HP's website, Joyce is a member of both the Audit Committee and the Technology Committee.  Joyce is a citizen of Connecticut.  In 2007, Joyce received $70,756 in compensation for serving as an HP director.  In 2008, Joyce received $273,200 in compensation and in 2009, Joyce received $289,579.

26.     Defendant Robert L. Ryan ("Ryan") is and has been a director of HP since 2004 and has served as the Company's Lead Independent Director since September 2008.  According to HP's website, Ryan is Chairperson of the Audit Committee.  In addition, Ryan is a member of both the Public Policy Committee and the Technology Committee.   Ryan is a citizen of Minnesota.  In addition to his directorship at HP, Ryan is a director of General Mills, Inc., the Black & Decker Corporation and Citigroup Inc.  Ryan and the rest of the Black & Decker board were sued in 11/09 for breaching their fiduciary duties to shareholders in connection with Black & Decker's acquisition of the Stanley Corporation.  That litigation is still pending.  Ryan is also a defendant in several securities fraud class actions pending in the S.D.N.Y. on behalf of the purchasers of Citigroup's common stock and bonds.  Those actions are still pending and motions to dismiss were recently denied.  During 2008, a securities fraud class action naming Ryan in his capacity as a director of UnitedHealth settled, with UnitedHealth paying over $900 million in damages to shareholders arising out of the UnitedHealth board's backdating of stock options.  In 2007, Ryan received $272,076 in compensation for serving as an HP director.  In 2008, Ryan received $310,799 in compensation and in 2009, Ryan received $430,497.

27.     Defendant Lucille S. Salhany ("Salhany") is and has been a director of HP since 2002.  According to HP's website, Salhany is Chairperson of the Nominating and Governance Committee and is a member of both the Audit Committee and the HR and Compensation Committee. Salhany is a citizen of Massachusetts.   In 2007, Salhany received $257,257 in compensation for serving as an HP director.   In 2008, Salhany received $300,574 in compensation and in 2009, Salhany received $330,420.

28.     Defendant G. Kennedy Thompson ("Thompson") is and has been a director of HP since 2006.  According to HP's website, Thompson is a member of the Audit Committee, the Finance and Investment Committee, and the Nominating and Governance Committee. Thompson is a citizen of North Carolina.  Thompson previously served as chairman, president, and CEO of Wachovia Corporation from 2000 through 2008.  Thompson, then head of the nation's fourth-largest bank – and a 32-year company veteran, was pushed out of Wachovia on 6/2/08 following months of shareholder criticism and deteriorating financial performance amid turmoil in the U.S. housing market.  According to a 6/3/08 *Wall Street Journal* account, the "surprise ouster was the culmination of a four-day drama inside the bank's Charlotte, N.C., headquarters" when Wachovia's chairman "informed Mr. Thompson that he'd lost the confidence of the board and should retire.  By Sunday afternoon, when the board met, he was out." According to *The Wall Street Journal*'s sources, Thompson was slow to acknowledge how seriously the bank's credit profile was deteriorating following his $25+ billion acquisition of Golden West at the height of the real estate financial bubble.  Data on the performance of Golden West's adjustable-rate-mortgage portfolio -- which Wachovia did not disclose separately after the acquisition – was far worse than internal projections had indicated.  Thompson remained too optimistic about the company's prospects, and according to *The Wall Street Journal's* source, "[w]hat [Thompson had] been telling the board hasn't been realistic." Golden West's mortgage-related problems led to Wachovia suffering write-downs and losses that far exceeded the price paid in the acquisition, ending up in the fire-sale of Wachovia to Wells Fargo in 12/08. Moreover, in the weeks leading up to Thompson's dismissal, Wachovia's image had been

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      10

1    tarnished by revelations of a federal criminal investigation into alleged laundering of drug money

2    between U.S. banks and Mexican and Colombian money-transfer companies. Separately,

3    Wachovia paid $144 million to settle another case involving an alleged telemarketing scam

4    conducted by firms that fraudulently obtained bank account data from elderly Wachovia

5    customers. In 2007, Thompson received $155,126 in compensation for serving as an HP

6    director. In 2008, Thompson received $271,577 in compensation and in 2009, Thompson

7    received $301,764. According to a settlement agreement between HP and certain derivative

8    plaintiffs in connection with an unrelated 2006 corporate governance scandal at HP, Defendant

9    Thompson was appointed in November 2006 to be a new independent director responsible for

10    reviewing compliance and ethical requirements related to investigations. As part of his

11    responsibilities in this role, Thompson was to review and report to the Board regarding HP's

12    compliance with legal and ethical requirements related to conduct of investigations.

13         29.    This complaint refers to Andreessen, Babbio, Baldauf, Gupta, Hammergren,

14    Hyatt, Joyce, Ryan, Salhany and Thompson collectively as the "Director Defendants." These ten

15    individuals comprised HP's Board at the time the complaint was filed and all ten of these

16    individuals served on HP's Board for at least part of the 2007-2009 period when the Board

17    sanctioned the illegal marketing activity at HP.

18         30.    The present membership of the five standing committees of the Board, (1) Audit,

19    (2) Finance and Investment, (3) HR and Compensation, (4) Nominating and Governance,

20    (5) Public Policy, and (6) Technology, can be summarized as follows:

| Name of Director | Audit | Finance and Investment | HR and Compensation | Nominating and Governance | Public Policy | Technology |
|---|---|---|---|---|---|---|
| Marc L. Andreessen | | | | | X | X |
| Lawrence T. Babbio | | X | X | X | | |
| Sari M. Baldauf | X | | | X | | X |
| Rajiv L. Gupta | | | X | | X | X |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT        11

| Name of Director | Audit | Finance and Investment | HR and Compensation | Nominating and Governance | Public Policy | Technology |
|---|---|---|---|---|---|---|
| John H. Hammergren | | X | X | | | |
| Joel Z. Hyatt | | X | X | | X | |
| John R. Joyce | X | | | | | X |
| Robert L. Ryan | X | | | | X | X |
| Lucille S. Salhany | X | | X | X | | |
| G. Kennedy Thompson | X | X | | X | | |

31.     According to HP's proxy statement dated January 29, 2008, it appears that in 2007, the Audit Committee consisted of Robert L. Ryan, Sari M. Baldauf, John R. Joyce, Lucille S. Salhany and G. Kennedy Thompson.

32.     According to HP's proxy statement dated January 20, 2009, it appears that in 2008, the Audit Committee consisted of the same members as in 2007.

33.     According to HP's proxy statement dated January 27, 2010, it appears that in 2009, the Audit Committee consisted of the same members as in 2007.

**Defendant Mark Hurd**

34.     Defendant Hurd, a resident of California, joined HP in early 2005 as its CEO.  In September 2006, Hurd was appointed Chairman of the Board.  According to statements made at HP's August 6, 2010 conference call with analysts, Hurd was terminated as a result of systemic unethical behavior and dishonesty in connection with payments he caused to be made from HP to Jodie Fisher, an HP consultant who had filed sexual harassment charges against Hurd.  At the August 6, 2010 call, HP's general counsel denied that any other dishonest acts or improper behavior on Hurd's part had prompted the action of the Board – *i.e.*, the Board had not sanctioned Hurd in connection with the kickback or FCA schemes alleged in the FCA complaints.  In a recent letter to *The New York Times*, incoming HP Chairman Ray Lane charged that Hurd was a liar who "violated the trust of the Board by repeatedly lying to them in the course of an investigation into his conduct."  Lane further stated that "[Hurd] violated numerous

elements of HP's Standards of Business Conduct and he demonstrated a serious lack of integrity and judgment."

35.    From 2007 through 2009 Hurd was paid the following compensation at HP:

| Year | Salary | Bonus | Stock Awards | Options Awards | Cash Incentive Compensation | Pension/ Deferred Comp | Other | Total |
|------|--------|-------|--------------|----------------|------------------------------|------------------------|-------|-------|
| 2009 | $1,268,750 | $1,180,340 | $10,256,370 | $2,520,906 | $14,629,074 | $1,895 | $475,192 | $30,332,527 |
| 2008 | $1,450,000 | $5,341,882 | $12,943,621 | $3,447,542 | $18,590,000 | $5,087 | $596,410 | $42,372,542 |
| 2007 | $1,437,500 | $1,386,000 | $6,238,795 | $3,724,919 | $11,949,789 | $2,386 | $400,441 | $25,139,830 |

36.    For 2009, Hurd was reported to be the fourth highest paid CEO in the United States.  Hurd's 2008 cash bonus of $23.9 million (bonus plus cash incentive compensation) was reported to be the largest paid to any of the 200 CEOs surveyed by *The New York Times* in that year.

37.    According to HP's proxy statement dated January 27, 2010, the HR and Compensation Committee of the Board "makes recommendations regarding the CEO's compensation to the independent members of the Board."  "In evaluating the performance of the CEO and recommending his compensation to the independent members of the Board, the Committee takes into account corporate financial performance, as well as performance on a range of non-financial factors, including accomplishment of strategic goals, workforce development and diversity, succession planning, and his working relationship with the Board."

38.    As justification for the $30,332,527 in compensation paid to Hurd in 2009, it was reported in HP's January 27, 2010 proxy that  "Overall, the Committee and the Board believe that, under the CEO's leadership in fiscal 2009, HP achieved solid financial results in a difficult economic environment and that he also continued to demonstrate significant achievement on a broad range of non-financial goals, including the integration of acquired companies, talent management and succession planning."

39.    As justification for the $42,372,542 in compensation paid to Hurd in 2008, it was reported in HP's January 20, 2009 proxy that "Overall, the Committee and the Board believe that, under the CEO's leadership in fiscal 2008, HP achieved strong financial results in a difficult

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        13

1   financial environment and also continued to demonstrate significant achievements on a broad

2   range of non-financial goals, including strategic acquisitions, talent management and succession

3   planning."

4       40.    As justification for the $25,139,830 in compensation paid to Hurd in 2007, it was

5   reported in HP's January 29, 2008 proxy that "Overall, the Committee and the Board believe that

6   HP, under the CEO's leadership in fiscal 2007, achieved superior financial results, as well as

7   significant achievement on a broad range of non-financial goals, including strategic acquisitions,

8   talent management and succession planning."

9       **THE DIRECTOR DEFENDANTS' RESPONSIBILITIES AND DUTIES**

10       41.    Under Delaware law, the Board of Directors bears ultimate responsibility for the

11   management of HP.   8 Del. C. §141 provides that the "business and affairs of every

12   corporation . . . shall be managed by or under the direction of a board of directors."  While this

13   provision grants a Board of Directors a significant amount of power over the affairs of a

14   corporation, Directors are not free to treat a public corporation as a private fiefdom for their own

15   enrichment.  Delaware law places limits on Directors' discretion so that corporations might act

16   lawfully and serve the interest of their shareholders.

17       42.    A Board cannot knowingly cause or allow a corporation to act illegally.  As the

18   Delaware Chancery Court stated, "Delaware corporate law has long been clear on this rather

19   obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the

20   corporation to consciously cause the corporation to act unlawfully," and "[t]he knowing use of

21   illegal means to pursue profit for the corporation is director misconduct." *Desimone v. Barrows*,

22   924 A.2d 908, 934-35 (Del. Ch. 2007).  "Under Delaware law, a fiduciary may not choose to

23   manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will

24   result in profits for the entity."  *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*,

25   *Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

26       43.    This point of law was further explained in a treatise:

27       The business judgment rule does not protect decisions by directors that constitute
    . . . illegality, or ultra vires conduct. Therefore . . . a decision by directors that a

28

violation of law or fraudulent or ultra vires conduct would serve the best interests of the corporation is not protected by the business judgment rule.

*Dennis J. Block, Nancy E. Barton & Stephen A. Radin, The Business Judgment Rule: Fiduciary Duties of Corporate Directors* at 41-42 (4th ed. 1995).

44.     In addition to being barred from causing illegal acts, directors must comply with their fiduciary duty to the corporation. "In carrying out their managerial roles, directors are charged with an unyielding fiduciary duty to the corporation and its stockholders. The director's fiduciary duty to both the corporation and its stockholders has been characterized by the Delaware Supreme Court as a due care and loyalty." *Folk on the Delaware General Corporation Law*, §141.2.1 (2010).

45.     The duty of care requires that directors use that amount of care that ordinarily careful and prudent men would use in similar circumstances.

46.     The duty of loyalty embodies both an affirmative duty to protect the interests of the corporation and an obligation to refrain from conduct that would injure the corporation and its stockholders or deprive them of profit or advantage. The duty of loyalty requires that directors eschew any conflict between duty and self-interest. The fiduciary duty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith.

47.     Beyond these duties, HP's Board of Directors "are required to act consistently with" HP's code of ethics, the Standards of Business Conduct (SBC). Violations of the SBC are supposed to result in "disciplinary action, up to and including termination of employment."

48.     The SBC sets forth three questions that an HP Director should ask before taking an action: "Is it legal?" "Is it consistent with HP values, SBC, and policies?" "Would others think it was OK if they read it in a news story?" If the answer to any of these questions is "No," the SBC requires the Director not take the action.

49.     The SBC set forth various ethical mandates. Some of the mandates relevant to this action are:

• Make "[e]thical" decisions

• "Obey the law and HP policies"

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    15

• "Take action" when "aware of misconduct"

• "Work with HP Legal to respond to litigation or requests from government and other external agencies"

• "Tell the whole truth when responding to an investigation"

• "Make decisions in the best interest of HP"

• "Exchange gifts and entertainment that foster goodwill in business relationships, but never provide or accept gifts, favors, or entertainment that may create undue influence, or even the appearance of undue influence."

• "Do not offer or provide bribes or kickbacks to win business or to influence a business decision – anywhere on anything."

50.     According to the SBC, "Uncompromising integrity" is one of HP's "Shared Values." The SBC further instructs "We are open, honest, and ethical in all of our dealings."

51.     The Corporate Governance Guidelines adopted by the Board ("CGG") in conjunction with the Certificate of Incorporation, Bylaws and the charters of the committees of the Board form the framework for governance of HP.

52.     The CGG states that "[t]he Board of Directors oversees and provides policy guidance on the business and affairs of HP.  Among other things, the Board monitors overall corporate performance, the integrity of HP's controls and the effectiveness of its legal, ethics and compliance programs."

53.     The CGG states that "The Board expects all directors, as well as officers and employees, to display the highest standard of ethics, consistent with HP's longstanding values and standards . . . Directors are expected to comply with the letter and the spirit of the [SBC], to focus on areas of ethical risk, to report unethical conduct and to help foster a culture of honesty and accountability." "The Board also expects directors, officers and employees to acknowledge their adherence to the Standards of Business Conduct on an annual basis."

54.     In connection with these duties, the Board receives annual and semiannual reports from an Ethics and Compliance Committee comprised of the Chief Ethics and Compliance

Officer, the Controller, the Executive Vice President of Human Resources, the General Counsel, the Chief Financial Officer and at least one senior executive liaison representative to a business unit. One of the Ethics and Compliance Committee's responsibilities is overseeing HP's compliance with applicable laws and regulations.[1]

55. The Board also receives various semi-annual and annual reports from HP's Compliance Committee, which is comprised of the Chief Ethics and Compliance Officer, the Chief Privacy Officer, the Vice President of Internal Audit, the Deputy General Counsel for Corporate and Securities M&A, the Director of Compliance, and liaisons between the Compliance Council and HP's business units.

56. The Audit Committee of the Board has additional responsibilities regarding HP's compliance with the law. The Audit Committee charter provides:

> The Committee will review the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls reported by the independent registered public accounting firm, the internal auditors or management, any special audit steps adopted in light of material control deficiencies, and any fraud, whether or not material, that involves management or other HP employees who have a significant role in such controls.

57. The Audit Committee charter also states:

> The Committee will oversee HP's ethics and compliance programs with respect to legal and regulatory requirements, and review with management and the Director of Internal Audit the results of their review of compliance with applicable laws, regulations and listing standards, HP's Standards of Business Conduct and internal audit reports. The Chief Ethics and Compliance Officer shall have the express authority to communicate personally to the Committee, including authority to promptly communicate personally to the Committee on any matter involving criminal conduct or potential criminal conduct and authority to communicate no less than annually on the implementation and effectiveness of the ethics and compliance program.

---

[1] This Ethics and Compliance Committee was reconstituted in the wake of an unrelated corporate governance scandal in 2006 concerning allegations that HP's management improperly spied on HP employees in an attempt to investigate leaks to the media. The matter was described at length in HP's most recent SEC Form 10-Q, dated September 9, 2010.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    17

58.     The Audit Committee charter states that:

The Committee will review the results of significant investigations, examinations or reviews performed by regulatory authorities and management's response.

### THE KICKBACK AND FALSE CLAIMS ACT SCHEME

**The False Claims Act**

59.     Originally enacted in 1863, the False Claims Act (FCA) is the most frequently used of a handful of extant laws creating a form of civil action known as *qui tam*. The FCA imposes civil liability upon "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. Government. 31 U.S.C. §3729(a).

60.     The False Claims Act was amended in 1986 to send a "clear and strong message that there must be an end to . . . procurement fraud." 132 Cong. Rec. S1784-85 (1986). Congress intended these monetary sanctions both to punish and deter fraud, in light of the billions of dollars spent on "contracts with private corporations in areas such as defense, aerospace, and construction." 131 Cong. Rec. S10853 (1986).

61.     As the Court of Appeals for the Federal Circuit has noted, the rationale of preventing procurement fraud "is even stronger, since private sector contractors have an increasing role in providing services to the federal government." *Morse Diesel Intern., Inc. v. U.S.*, 79 Fed. Cl. 116, 127 (Fed. Cl. 2007). For example, between 2000 and 2006, there was an increase in federal outsourcing from $219.3 billion to $415.4 billion.

62.     Currently, each violation of the FCA subjects the violator to a civil penalty of not less than $5,500 and not more than $11,000 for each violation. In addition, a violator is liable for three times the amount of all damages sustained by the U.S. Government.

**The Anti-Kickback Act**

63.     The Anti-Kickback Act ("AKA") was passed in 1986, the same year the FCA was amended, and is part of the same effort to prevent corruption in government contracts.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                18

64.    41 U.S.C. §53 provides that:

It is prohibited for any person --

(1) to provide, attempt to provide, or offer to provide any kickback;

(2) to solicit, accept, or attempt to accept any kickback; or

(3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

65.    41 U.S.C. §55 provides that for each kickback there shall be a civil penalty amounting to (1) twice the amount of each kickback involved in the violation plus (2) not more than $10,000 for each kickback.

**HP's Illegal Marketing Activities**

66.    In 2004, *qui tam* Relators that had been employed at NCR Corporation (an information technology company where Hurd had also been employed), and at systems integrators servicing government contractors , including Accenture LLP, filed a series of eight FCA lawsuits on behalf of the United States.  One of the Relators, Norman Rille, had based these claims in large part, on 700,000 pages of documents taken from Accenture LLP when he left its employ.  Many of the incriminating documents were attached as exhibits to various of the FCA complaints.  These FCA complaints were filed under seal, and investigated by the DOJ and government agents and auditors over three years, when the FCA cases were unsealed, and the government intervened.   In the course of the government's investigation, the government subpoenaed and reviewed millions of pages of documents.

67.    According to the various FCA complaints filed by the Relators and by the DOJ, including the complaints filed against HP, HP and various other information technology vendors (including NCR's Teradata division where Hurd had been employed before coming to HP) formed "alliances" with systems integrators, such as Accenture LLP, which had been retained by the government to provide impartial advice and to act on the government's behalf in making decisions to select information technology vendors and to price information technology products and services purchased by the government.   Pursuant to the alliance arrangements, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    19

1   information technology vendors, including HP, secretly paid the systems integrators "millions of

2   dollars" worth of "influencer fees" and other payments when the government awarded the

3   vendors contracts pursuant to the systems integrators' efforts.

4       68.    For example, HP is alleged to have entered into agreements with Alliance

5   Partners wherein it paid kickbacks, including referral fees, influencer fees, systems integration

6   compensation fees, reseller fees, commission, free or discounted products and or services, equity

7   ownership, profit sharing and other benefits.

8       69.    HP internally called this kickback scheme the PartnerONE program.   The

9   program was implemented in or around November 2002.   The purported purpose of the

10  PartnerONE program was to provide partners with various tools to help generate new business,

11  reach new customers and "triumph over competition."   Under the aegis of this program, HP

12  formed alliances with, among others, Accenture Ltd., BearingPoint Technology Procurement

13  Services, LLC, Computer Sciences Corporation, Electronic Data Systems, GTSI Corporation,

14  International Business Machines Corporation, KPMG Enterprise Integration Services, LLC,

15  Lockheed Martin, Northrop Grumman, Cap Gemini Ernst & Young, Raytheon Company and the

16  Science Applications International Corporation.

17      70.    HP paid its partners "influencer fees" when they successfully referred U.S.

18  Government end users to purchase HP products.   HP also paid "influencer fees" for favorable

19  treatment in the procurement process.   HP required its partners to submit claim forms to receive

20  influence fees for certain products.   For example, on August 27, 2003, HP's Alliance Partner,

21  Accenture, submitted a request for compensation to HP for influence and favorable treatment

22  resulting in the sale of HP product directly by HP to the Defense Logistics Agency (DLA).   The

23  HP representatives on the deal were Frances Smithson and Cliff Koch.   Similarly, Robert Stresler

24  of GTSI submitted Deal Registration D03595 in 2005 seeking influencer fees for getting the

25  Department of the Army to choose HP hardware over Dell and/or Sun hardware that was being

26  considered.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    20

71.    Between 2002 and 2009, HP paid millions of dollars worth of influencer fees to its Alliance Partners for such successful influence.  Among the recipients of HP influencer fees were Accenture, Bearpoint, Cap Gemini Ernst & Young, Electronic Data Systems, GTSI, Northrop Grumman, Science Application International Corporation and Unisys.

72.    In addition to its influencer fees, since 2003, HP provided its Alliance Partners with New Business Opportunity Compensation ("NBO") in return for influence and favorable treatment by its Alliance Partners on "resale transactions" with the Government.    Resale transactions are transactions in which HP's Alliance Partners would subcontract with HP for purchase of HP products and services and then resell those HP products and services to the government.

73.    NBO rebates were offered by HP to its Alliance Partners to create new business for HP.  The intent of NBO was to compensate Alliance Partners for generating HP business with government end users.

74.    The NBO was designed by HP to benefit HP and the Alliance Partners but not the government.  HP specifically informed its Alliance Partners that HP did not extend competitive pricing to end users through the NBO.  Alliance Partners were directed to use other HP devices, such as "Big Deal Pricing," if they wished to extend price reductions to the end user.  If price reductions were extended to the government, HP would reduce NBO accordingly.

75.    In order to qualify for NBO pricing, an HP Alliance Partner had to demonstrate that it had provided presales consulting services to the customer and influenced the sale, such as recommending the HP product or providing systems integration consulting.

76.    For example, on September 25, 2006, HP paid NBO to Northrop Grumman Information Technology ("NGIT") in the amount of $161,448 in connection with Defense Medical Information Management Office.  On January 14, 2005, HP paid NBO to NGIT in the amount of $123,117 for a Department of State contract.  Also on September 25, 2006, HP paid NBO to GTSI in the amount of $138,096 in connection with a contract with the Department of

1    the Army at Fort Huachuca.  On October 30, 2006, HP paid NBO to GTSI in the amount of

2    $127,362 in connection with a contract for the FBI Terrorist Screening Center.

3            77.     As another example, the Relators have alleged that as part of the HP-Accenture

4    Alliance, a "world-wide agreement" existed which provided Accenture a "Systems Integrator

5    Reseller (SIR) discount" for HP products.  This discount was applied to the resale of certain HP

6    products as long as they were purchased as part of an Accenture project.  The agreement alleged

7    stated, "This Information is confidential (do not share with clients)."  The Relators further

8    alleged that the existence of the Accenture/HP alliance agreement was not to be released to

9    clients, other vendors, or the media.

10           78.     The DOJ, at an April 3, 2009 argument on the motion to dismiss for one of the

11   FCA *qui tam* complaints against Accenture, explained why these arrangements were illegal, and

12   constituted violations of the federal Anti-Kickback Act and the FCA:

> It is entirely lawful for a company to engage in alliances and even to receive
> payments and other forms of revenue as a result of these alliances.  Instead, your
> Honor, our case, which is based upon the information and allegations first
> advanced to the government by the relators, depends critically on the facts about
> the specific way Accenture chose to carry out its alliance relationship on contracts
> with the United States Government.  Our case is about the fact that Accenture for
> more than eight years systematically submitted false and fraudulent claims to
> more than 25 agencies of the United States Government on multi-million-dollar
> contracts on which it was supposed to be providing unbiased advice and
> assistance concerning information technology integration.
>
> These claims, your Honor, were false and fraudulent not just because Accenture
> had alliances and received payments under alliances, but rather because
> Accenture used these alliances to receive kickbacks on government contracts,
> engage in conflict of interest activities on government contracts, improperly
> overcharged the government for information technology products and services,
> and engaged in bid rigging with its alliance partners of federal government
> contracts.  These facts about the way the alliances are used by Accenture are the
> essential elements of our claims.
>
>                                  *          *          *
>
> Those kickbacks don't arise, your Honor, just because an alliance between
> Accenture and another company exists.  Those kickbacks arise because Accenture
> was being paid undisclosed cash and other things of value by technology vendors
> to influence and provide favorable treatment in connection with the award of
> federal government contracts.  That is the definition of a kickback under the Anti-
> Kickback Act.  That influence and the favorable treatment is what converts an
> otherwise lawful activity, which is what is referred to in the disclosures in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                         22

Accenture's motion, it converts that activity into a violation of the Anti-Kickback Act.

The essential elements here are not just that Accenture was receiving money. The essential facts that were first disclosed by the relators are that Accenture was trading its influence with government officials in violation of its material contractual obligations while at the same time receiving money from those very same government agencies for what was supposed to be unbiased and impartial advice.

April 3, 2009 Tr. at 14:10-16:6.

79.     During this same argument, the DOJ also explained several of the incriminating documents produced by the Relators, documents which corroborated the details of the scheme – particularly with respect to the Accenture-NCR relationship at the time when Hurd was NCR's marketing head:

Now, your Honor, with respect to the allegations in the complaint of relators, it is worthy of note now to mention that in Exhibit G to the complaint that relators have identified alliance agreements between Accenture and NCR that provide for kickbacks, whether they be cash, a 5 to 8 percent fee, or a resale discount as a kickback in the amount of 20 to 30 percent. That is in Exhibit G.

The Exhibit E also identifies federal jobs on which Accenture was expecting kickbacks under their agreement with NCR. Those included U.S. Postal Service, Air Force, Federal Aviation Administration, US Air, D.C. Tax & Revenue, NAVAIR, U.S. Air Force First, Homeland Defense, Global Transportation Network. The government has, in fact, intervened as to various of these same contracts identified by relators.

Clearly the relators have satisfied any requirements of who, what, where, and when, and that is the classic test. The before-mentioned examples provide who Accenture is receiving kickbacks from: NCR. What kind of kickbacks are they receiving? Cash and discounts from NCR. Where the wrongdoing took place? Mainly on the above extensive list of federal government jobs. And when these jobs took place? *Approximately 2000 to 2002.*

April 3, 2009 Tr. at 21:4-25 (Emphasis added).

80.     Furthermore, on numerous occasions, HP had reasonable grounds to believe that violations of the AKA may have occurred, but failed to promptly report the possible violations in writing to the Inspector General. These failures were further violations of the AKA. 41 U.S.C. §57(c)(1).

81.     For example, on March 12, 2002, HP's Mark Lamdin and Marilyn Cepuran, an HP Global Business Manager, notified Accenture that HP's influencer fees on the Defense

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      23

1   Logistics Agency (DLA) Contract would have to be disclosed because "federal law requires such

2   disclosure." Despite this knowledge and intent, neither HP nor Accenture disclosed the

3   influencer fees related to the DLA.

4       82.    By Order also dated April 3, 2009, the Honorable Wm. R. Wilson, Jr. sustained

5   the Relators' complaint against Accenture, holding that it had adequately pled fraud pursuant to

6   Fed. R. Civ. P. 9(b). On July 24, 2009 Judge Wilson sustained claims pled against Accenture by

7   the Government Complaint in Intervention, and particularly the allegations that in 2002 and 2003

8   Accenture and its alliance partner, NCR's Teradata division, had engaged in bid-rigging on

9   government contracts.

10       83.    Hurd headed NCR's Teradata division from July 2000 to September 2002. He

11   was NCR's Chief Operating Officer from September 2002 until March 2003 and served as

12   NCR's CEO from March 2003 until July 2005 when he joined HP. The Relators' Second

13   Amended Complaint against HP, dated October 2006, and unsealed in April 2007, discussed

14   Hurd's personal involvement and knowledge of the Alliance scheme between NCR and

15   Accenture:

> In approximately 1996, Lars Nyberg took over as Chief Executive Officer at NCR, and advised the NCR personnel, including Relator Rille, that NCR was going to change their marketing strategy to aggressively "go to market through Alliance Partners," who were systems Integration Consultants, and that they were going to create Alliance relationships with all the major Systems Integration Consultants. **Mark Herd [sic], VP of Marketing, and Dale Hazel, Relator Rille's superior, also repeated those same messages in various group NCR meetings that Relator Norman Rille attended.**

(*See* Exhibit B, ¶22) (emphasis added).

22       84.    As described in the Relators' memorandum seeking fees for the settlement of the

23   FCA complaint against HP, the evidence of widespread illegal activity at HP was first presented

24   to HP's management in late 2006/early 2007:

> [T]wo months after Relators amended their Complaint, the Government sought leave of Court to discuss Relators' allegations with HP. Shortly after the Government informed HP of Relators' allegations, HP notified the Government that it had retained outside consultants to investigate HP's pricing practices.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     24

The Relators' Second Amended Complaint is dated October 25, 2006.  Therefore, around December 2006, the government sought permission to make HP aware of the widespread illegal marketing activity at the Company.

85.     According to the Recitals in HP's settlement agreement (Exhibit A), HP told the Government Services Administration ("GSA") that it had hired the consultants on February 28, 2007, indicating HP's awareness of the charges against it.  Furthermore, the U.S. Government filed a Complaint in Intervention alleging False Claims Act and Anti-Kickback Act claims against HP on April 12, 2007.

86.     HP acknowledged the existence of the government's complaint in its SEC Form 10-Q, dated June 8, 2007.  The 10-Q stated:

*The United States of America, ex rel. Norman Rille and Neal Roberts v. Hewlett-Packard Company, et al.*  In 2004, two private individuals filed a civil "qui tam" complaint under the False Claims Act in the United States District Court for the Eastern District of Arkansas containing generalized allegations that HP and several other companies participated in an industry-wide practice of using partnership and alliance programs to make improper payments and cause the submission of false claims in connection with contracts to provide products and services to the federal government.  On April 12, 2007, the U.S. Department of Justice intervened in the qui tam action and filed a complaint against HP and four other companies on behalf of the United States containing more specific allegations that HP violated the False Claims Act and the Anti-Kickback Act of 1986 by providing millions of dollars in kickbacks to its alliance partners, including "influencer fees" and "new business opportunity rebates."  The U.S. complaint further alleges more specifically that HP violated the False Claims Act and the Anti-Kickback Act, breached its federal government contracts, induced the federal government to make payments to HP to which HP was not entitled to receive under those contracts, and was unjustly enriched by expressly or impliedly making false statements, records or certifications to the federal government that it complied with and would continue to comply with the Anti-Kickback Act and by submitting claims to the government that allegedly were inflated because they included the amounts of the influencer fees and new business opportunity rebates.  The U.S. complaint seeks treble damages plus civil penalties in connection with the alleged violations of the False Claims Act, double damages plus civil penalties in connection with the alleged violations of the Anti-Kickback Act and disgorgement of profits earned in connection with the breach of contract and unjust enrichment claims.

87.     According to a settlement agreement between HP and derivative plaintiffs concerning an unrelated corporate governance scandal, "HP management provides it SEC Quarterly Reports on Form 10-Q to the Board prior to filing and reviews those Quarterly Reports prior to filing directly with the Audit Committee." Thus, the June 8, 2007 SEC Form 10-Q unequivocally established the Board's knowledge of the illegal and unethical conduct at HP.

88.     HP's SEC Form 10-K, dated December 18, 2007, has a similar description of the *Rille* FCA action.   In their capacity as Directors of HP, Defendants Babbio, Baldauf, Hammergren, Hyatt, Joyce, Ryan, Salhany, and Thompson signed this SEC Form 10-K. Defendant Hurd, as Chairman, CEO and President of HP, also signed the SEC Form 10-K.

89.     Despite knowing that, based on a large body of documentary evidence, the U.S. Government was suing HP for a lengthy and extensive illegal marketing scheme, Defendants chose not to take appropriate action to correct the problem for several years.  According to the Recitals in the Settlement Agreement, the U.S. Government contends that the improper payments by HP continued "through December 31, 2009." Exhibit A, ¶D.  As the settlement agreement further explains, although HP disclosed certain instances of defective pricing on government contracts in 2008, HP had not fully informed GSA contracting officials of its defective pricing, which was only discovered through the audit conducted by the GSA's Office of Inspector General ("OIG").

90.     Furthermore, the Director Defendants continued to pay then-CEO Hurd oversized compensation based on his achievement of supposedly superior financial results, even though the Relators' allegations, which the U.S. Government had discussed with HP, had linked Hurd to an overlapping kickback scheme at Hurd's prior company, NCR, and Hurd failed to take adequate measures to address the ongoing kickback scheme at HP.   For 2007-2009, the Director Defendants authorized more than $97 million in compensation for Hurd despite the fact that under his leadership, HP was flagrantly violating the law, exposing itself to serious legal repercussions and artificially inflating its results through illegal marketing.

91.     In acting in this manner, the Director Defendants breached their fiduciary duty to HP by consciously allowing HP employees to engage in illegal activity and by rewarding Hurd for his conscious decision to allow HP employees to engage in illegal activity. The Director Defendants also violated HP's own code of ethics, even though they are supposed to affirm their adherence to this code on an annual basis.

92.     Defendants' breach of their fiduciary duty has cost HP millions of dollars and tarnished its reputation. On August 30, 2010, HP and the United States settled the civil FCA and AKA claims in return for $55 million. Ex. A at 3-4.

93.     Unfortunately, the ramifications for HP may end up being considerably more damaging. In accordance with Supreme Court precedent, a contract procured through the payment of kickbacks may be rescinded by the government. In accordance with federal acquisition regulations (the "FAR"), 48 C.F.R. Subpart 9.4, contractors and persons violating the FCA may be suspended or debarred from bidding on future government contracts. Under a Final Rule published November 12, 2008, 73 Fed. Reg. 67064, a contractor may be suspended or debarred when it fails to disclose "credible evidence" that its employees have violated the civil FCA. From 2007 through 2009, HP received payments on government contracts exceeding $880 million. Thus, the stakes to HP, and the financial exposure of the individual defendants, is great for flouting federal law in connection with HP's government procurements.

94.     In addition, the settlement agreement expressly reserved and did not release a number of categories of claims, including "[a]ny criminal liability." Ex. A. at 4. This would permit HP to be further prosecuted in connection with Defendants' actions. There may well also be future prosecution of Hurd and the HP Directors as the settlement agreement reserved and did not release "[a]ny liability of individuals."

**The Foreign Corrupt Practices Investigations**

95.     According to news reports, German and Russian authorities are investigating whether three HP executives bribed officials in Russia to obtain the contract. According to the reports, the executives paid approximately €8 million ($10.9 million) in bribes to win the

1  €35 million contract.  The bribes allegedly were paid by former HP German subsidiary Hewlett-

2  Packard International Sales Europe ("ISE") GmbH after it was awarded the contract.

3       96.     The HP executives under investigation are, according to German court records:

4  Hilmar Lorenz ("Lorenz"), the former head of HP sales in Russia and the Soviet Union; Kenneth

5  Willett ("Willett"), who led the HP unit based in Germany that dealt with equipment sales in

6  Europe, the Middle East, and Africa from 2003-2007; and Paeivi Tiippana ("Tiippana"), who

7  preceded Willett as head of the German-based unit.  Lorenz is currently employed by HP but has

8  been placed on administrative leave.

9       97.     Lorenz and Willett were arrested by German officials on or about December 2,

10  2009, and released on €160,000 and €250,000 bail, respectively.  Tiippana was arrested in

11  Switzerland on or about December 2, 2009, and released from jail on or about December 30,

12  2009.

13       98.     HP learned of the investigation in December 2009 when police in Germany and

14  Switzerland presented search warrants in connection with the probe.  Nonetheless, HP's role was

15  first publicly disclosed by HP in its Form 10-Q filed September 9, 2010.

16       99.     On April 14, 2010, Russian investigators raided HP's Moscow offices in

17  connection with the investigation at the request of German authorities.

18       100.    It was subsequently disclosed that the DOJ and the SEC were investigating HP for

19  possible violations of the FCPA, and that HP met with the SEC on April 15, 2010 regarding the

20  German investigation.

21       101.    On September 9, 2010, HP filed its Form 10-Q with the SEC for the period

22  ending July 31, 2010, wherein for the first time the Company revealed that the German Public

23  Prosecutor's Office has been conducting an investigation into allegations that current and former

24  employees of HP engaged in bribery, embezzlement and tax evasion relating to a transaction

25  between Hewlett-Packard ISE GmbH in Germany, a former subsidiary of HP, and the Chief

26  Public Prosecutor's Office of the Russian Federation.  The September 9, 2010 Form 10-Q gave

27  the following additional details about the German and Russian investigations:

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    28

The €35 million transaction, which was referred to as the Russia GPO deal, spanned 2001 to 2006 and was for the delivery and installation of an IT network. The German PPO has recently requested information on several non-public sector transactions entered into by HP and its subsidiaries on or around 2006 involving one or more persons also involved in the Russia GPO deal.

102.    The September 9, 2010 Form 10-Q also revealed the following information regarding the SEC and the DOJ's investigation:

The U.S. Department of Justice and the SEC have also been conducting an investigation into the Russia GPO deal and potential violations of the Foreign Corrupt Practices Act ("FCPA"). ***Under the FCPA, a person or an entity could be subject to fines, civil penalties of up to $500,000 per violation and equitable remedies, including disgorgement and other injunctive relief. In addition, criminal penalties could range from the greater of $2 million per violation or twice the gross pecuniary gain or loss from the violation.*** The U.S. enforcement authorities have recently requested information from HP relating to certain governmental and quasi-governmental transactions in Russia and in the Commonwealth of Independent States subregion dating back to 2000.

(Emphasis added.)

103.    HP has provided no further detail except to state that it "is cooperating with these investigating agencies."

## DEMAND IS EXCUSED

104.    Demand is excused because this action challenges decisions by the Board that are not protected by the business judgment rule.  In late 2006 and early 2007, HP's Board was provided with extensive evidence showing that HP's Alliance marketing program violated the False Claims Act and the Anti-Kickback Act.  The Board was also provided with evidence linking then-CEO Mark Hurd to an overlapping illegal marketing scheme at Hurd's prior company, NCR.  Yet despite being fully apprised of these facts, as evidenced by HP's public acknowledgments of the charges, HP's Board chose not to take appropriate action to stamp out the illegal marketing activity.  Furthermore, HP's Board chose to award Hurd $97 million in compensation knowing that Hurd had consciously failed to take appropriate action to stamp out the illegal marketing activity.  This knowing use of illegal means to pursue profit for the corporation is director misconduct and not protected by the business judgment rule.  At a minimum, these allegations create a "reasonable doubt" that these decisions were the "product of a valid exercise of business judgment."  Accordingly, demand is futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                29

105.    Demand is excused because all of the members of HP's Board are interested in the decision to investigate and prosecute claims relating to HP's violations of the FCA and AKA. All of the members of HP's Board served for at least part of the 2007-2009 period when HP's Board was aware of the illegal marketing activities at HP but chose to allow those activities to continue. The FCA imposes liability on "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." Because HP's Board knew that HP employees were submitting false claims to the U.S. Government and had control over those employees, they may be subject to liability for "causing" false claims to be submitted to the U.S. Government. The U.S. Government's settlement with HP expressly did not release "[a]ny liability of individuals," suggesting that the U.S. Government is considering prosecution of the individuals involved in HP's wrongdoing. Each violation of the FCA subjects the violator to a civil penalty of not less than $5,500 and not more than $11,000 for each violation. In addition, a violator is liable for three times the amount of all damages sustained by the U.S. Government. Thus, HP's Board has a strong economic incentive to prevent the further investigation and exposure of their role in causing HP to violate the FCA. Because the entire Board is interested in this decision, demand is futile.

106.    Demand is excused because all of the members of HP's Board face a substantial likelihood of liability from Plaintiff's claims and so are interested in the decision to assert them. All of the members of HP's Board served for at least part of the 2007-2009 period when the Board chose to allow HP employees to engage in illegal marketing activities, paid then-CEO Hurd $97 million despite Hurd's conscious decision to allow illegal marketing activities and recklessly disregarded manifest red flags that HP lacked adequate internal controls and was engaged in illegal activities. These allegations demonstrate that HP's Board breached its fiduciary duties of loyalty and good faith. These breaches harmed HP by causing it to incur at least $55 million in penalties and paying Hurd $97 million in unwarranted and excessive compensation, money that HP is entitled to recover from its disloyal Board. As a result, all of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                30

HP's Board is interested in the decision to prosecute the claims asserted by Plaintiff and demand is futile.

### COUNT I

**BREACH OF FIDUCIARY DUTY FOR CAUSING THE COMPANY TO ENGAGE IN UNLAWFUL CONDUCT AND/OR CONSCIOUSLY DISREGARDING WIDESPREAD VIOLATIONS OF LAW**

**(Against the Director Defendants)**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Director Defendants all owed and owe fiduciary duties to HP and its shareholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe HP the highest obligation of good faith and loyalty in the administration of the affairs of HP, including the oversight of HP's compliance with federal laws governing the marketing of products to the U.S. Government.  Moreover, the Board had duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

109.    The Director Defendants consciously violated their corporate responsibilities in at least the following ways:

    a.  Deciding to allow HP employees to continue to violate the FCA and AKA with illegal marketing practices for the period from June 8, 2007 to December 31, 2009.

    b.  Authorizing $97 million in compensation payments to Hurd despite Hurd's conscious decision to allow HP employees to violate the FCA and AKA.

    c.  Consciously disregarding the abundant evidence that HP employees were engaged in widespread violations of the FCA, AKA and FCPA.

110.    As a direct and proximate result of the Director Defendants' conscious decision not to perform their fiduciary obligations, HP has sustained significant damages, not only monetarily, but also to its corporate image, goodwill and relationship with the U.S. Government

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    31

1    as a government contractor.   Such damage included, among other things, the substantial

2    penalties, fines, liabilities and expenses described herein.

3        111.   As a result of the misconduct alleged herein, the Director Defendants are liable to

4    the Company, and their continuing violations of duty should be enjoined.

5                                  **COUNT II**

6                         **BREACH OF FIDUCIARY DUTY**

7                            **(Against Mark Hurd)**

8        112.   Plaintiff incorporates by reference and realleges each and every allegation set

9    forth above, as though fully set forth herein.

10       113.   By reason of his position as fiduciary of the Company, Mark Hurd owed duties of

11   good faith and loyalty to HP.  Hurd was well aware that HP's marketing activities violated the

12   FCA and AKA, yet Hurd consciously allowed these practices for years in violation of his

13   fiduciary duty and HP's code of ethics.

14       114.   In addition, between 2007 and 2009, Hurd accepted unwarranted and excessive

15   executive compensation of $97 million despite knowing that he was breaching his fiduciary duty

16   to the Company by causing it to engage in illegal activity.

17       115.   As a direct and proximate result of Mark Hurd's breaches of fiduciary duty, the

18   Company has sustained, and will continue to sustain, substantial harm, including the damages set

19   forth herein.

20       116.   Mark Hurd is liable to the Company as a result of the acts alleged herein.

21                                 **COUNT III**

22                          **UNJUST ENRICHMENT**

23                       **(Against the Director Defendants)**

24       117.   Plaintiff incorporates by reference and realleges each and every allegation set

25   forth above, as though full set forth herein.

26       118.   By their wrongful acts and omissions, the Director Defendants were unjustly

27   enriched at the expense of and to the detriment of HP.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    32

1    119.   Plaintiff, as a shareholder and representative of HP, seeks restitution, damages, an

2  order of this Court disgorging all profits, benefits and other compensation obtained by these

3  Director Defendants from their wrongful conduct and fiduciary breaches, and other relief for the

4  Company, in an amount to be proven at trial.

5  **PRAYER FOR RELIEF**

6    WHEREFORE, Plaintiff demands judgment as follows:

7    A.   Determining that this action is a proper derivative action maintainable under law

8  and demand is excused;

9    B.   Awarding, against all Defendants and in favor of HP, the damages sustained by

10  the Company as a result of Defendants' breaches of fiduciary duties;

11    C.   Awarding to HP restitution from Defendants and ordering disgorgement of all

12  profits, benefits and other compensation obtained by the Defendants;

13    D.   Directing HP to take all necessary actions to reform and improve its corporate

14  governance and internal procedures, to comply with the Company's existing governance

15  obligations and all applicable laws and to protect the Company and its shareholders from a

16  recurrence of the damaging events described herein;

17    E.   Awarding to Plaintiff the costs and disbursements of the action, including

18  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

19    F.   Granting such other and further relief as the Court deems just and proper.

20  **JURY DEMAND**

21    Plaintiff demands a trial by jury.

22  DATED:  October 19, 2010            SCOTT+SCOTT LLP
                                       ARTHUR L. SHINGLER III
23                                     MARY K. BLASY
                                       LUIS E. LORENZANA
24

25

26                                     _____
                                       ARTHUR L. SHINGLER III
27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              33

707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619/233-4565
619/233-0508 (fax)

SCOTT+SCOTT LLP
DAVID R. SCOTT
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860/537-3818
860/537-4432 (fax)

SCOTT+SCOTT LLP
BETH A. KASWAN
THOMAS L. LAUGHLIN IV
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone: 212/223-6444
212/223-6334 (fax)

Counsel for Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34

## VERIFICATION

We, Gregory Simmons and Robert Ruth, trustees for the Saginaw Police and Fire Pension Fund declare that we have reviewed the attached Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Hewlett-Packard Company and authorize its filing. We have reviewed the allegations made in the Complaint, and to those allegations of which we have personal knowledge, we believe those allegations to be true. As to those allegations of which we do not have personal knowledge, we rely on our counsel and their investigation and for that reason believe them to be true. We further declare that Saginaw Police and Fire Pension Fund is a current holder, and has been a holder, of Hewlett-Packard common stock at relevant times.

10/18/20 10
Date

_____
Fire Representative

10/19/2010
Date

_____
Police Representative