1  JAMES E. LYONS (STATE BAR NO. 112582)
   James.Lyons@skadden.com
2  GARRETT J. WALTZER (STATE BAR NO. 130764)
   Garrett.Waltzer@skadden.com
3  THOMAS V. CHRISTOPHER (STATE BAR NO. 185928)
   Thomas.Christopher@skadden.com
4  RICHARD S. HORVATH, JR. (STATE BAR NO. 254681)
   Richard.Horvath@skadden.com
5  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue, Suite 1100
6  Palo Alto, California 94301
   Telephone: (650) 470-4500
7  Facsimile:  (650) 470-4570

8  Attorneys for Defendants
   MARC L. ANDREESSEN, LAWRENCE T. BABBIO,
9  SARI M. BALDAUF, RAJIV L. GUPTA,
   JOHN H. HAMMERGREN, JOEL Z. HYATT,
10 JOHN R. JOYCE, ROBERT L. RYAN, LUCILLE S.
   SALHANY and G. KENNEDY THOMPSON

11                 UNITED STATES DISTRICT COURT
12               NORTHERN DISTRICT OF CALIFORNIA
                       SAN JOSE DIVISION
13

14 SAGINAW POLICE & FIRE PENSION          )  CASE NO. 5:10-CV-04720-EJD
   FUND, Derivatively on Behalf of HEWLETT- )
15 PACKARD COMPANY,                       )  (1)  DIRECTOR DEFENDANTS'
                                          )  NOTICE OF MOTION AND (A)
16              Plaintiff,                )  MOTION TO DISMISS PLAINTIFF'S
                                          )  VERIFIED SHAREHOLDER
17      vs.                               )  DERIVATIVE COMPLAINT AND (B)
                                          )  JOINDER IN SUPPORT OF NOMINAL
18 MARC L. ANDREESSEN, LAWRENCE T.        )  DEFENDANT HEWLETT- PACKARD
   BABBIO, SARI M. BALDAUF, RAJIV L.      )  COMPANY'S MOTION TO DISMISS
19 GUPTA, JOHN H. HAMMERGREN, MARK        )
   V. HURD, JOEL Z. HYATT, JOHN R.        )  (2)  MEMORANDUM OF POINTS AND
20 JOYCE, ROBERT L. RYAN, LUCILLE S.      )  AUTHORITIES
   SALHANY, and G. KENNEDY THOMPSON,      )
21                                        )  Filed Under Separate Cover:
                Defendants,               )
22                                        )  (1) REQUEST FOR JUDICIAL NOTICE;
           -and-                          )
23                                        )  (2) DECLARATION OF RICHARD S.
   HEWLETT-PACKARD COMPANY,               )  HORVATH, JR. IN SUPPORT OF
24                                        )  REQUEST FOR JUDICIAL NOTICE;
   Nominal Defendant.                     )
25                                        )  and
                                          )
26                                        )  (3) [PROPOSED] ORDERS
                                          )
27                                        )  Date:      February 3, 2012
                                          )  Time:      9:00 a.m.
28                                        )  Courtroom: Courtroom 1, 5th Floor
   _____    )  Before:    Hon. Edward J. Davila

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2         Please take notice that on February 3, 2012, at 9:00 a.m., or as soon thereafter as the matter

3   may be heard by the Court, at the courtroom of the Honorable Edward J. Davila, Courtroom 1,

4   Fifth Floor, United States District Court, 280 South 1st Street, San Jose, California, defendants

5   Marc L. Andreessen, Lawrence T. Babbio, Sari M. Baldauf, Rajiv L. Gupta, John H. Hammergren,

6   Joel Z. Hyatt, John R. Joyce, Robert L. Ryan, Lucille S. Salhany and G. Kennedy Thompson (the

7   "Director Defendants") will and hereby do move the Court, pursuant to Rule 12(b)(6) of the

8   Federal Rules of Civil Procedure, for an order dismissing with prejudice Counts I and III contained

9   in the Verified Shareholder Derivative Complaint (the "Complaint") asserted against the Director

10   Defendants.  The motion will be based on this notice and motion, the accompanying memorandum

11   of points and authorities, the accompanying request for judicial notice, the declaration of Richard S.

12   Horvath, Jr., any other papers filed with the Court in connection with this motion, the arguments of

13   counsel and all other matters properly considered by the Court.  This motion to dismiss is brought

14   on the ground that the Complaint fails to state a claim against the Director Defendants upon which

15   relief can be granted.

16         In addition, the Director Defendants join in the motion of nominal defendant Hewlett-

17   Packard Company ("HP") to dismiss this action with prejudice pursuant to Rules 12(b)(6) and 23.1

18   of the Federal Rules of Civil Procedure for failure of the plaintiff to make a demand on the board

19   of directors of HP before commencing this shareholder derivative action or to plead with

20   particularity sufficient reasons to excuse demand.

21   DATED:  August 15, 2011

               SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

22

23

24            By:        /s/ James E. Lyons
               JAMES E. LYONS

25               Attorneys for Defendants
   MARC L. ANDREESSEN, LAWRENCE T. BABBIO,

26           SARI M. BALDAUF, RAJIV L. GUPTA,
     JOHN H. HAMMERGREN, JOEL Z. HYATT,

27      JOHN R. JOYCE, ROBERT L. RYAN, LUCILLE S.
     SALHANY and G. KENNEDY THOMPSON

28

**DIRECTOR DEFENDANTS' MOTION TO DISMISS**             **CASE NO. 5:10-CV-04720-EJD**

## TABLE OF CONTENTS

**PAGE**

STATEMENT OF ISSUES (N.D. CAL. CIVIL L.R. 7-4) ........................................................ 1

PRELIMINARY STATEMENT ........................................................................................... 1

I.   STATEMENT OF FACTS. ................................................................................ 4

    A.   The Parties. ........................................................................................ 4

        1.   Nominal Defendant HP. .......................................................... 4

        2.   The Outside Directors of HP. .................................................. 5

        3.   Mark Hurd. .............................................................................. 5

    B.   Plaintiff's Complaint Establishes That HP Had Extensive Reporting And Compliance Procedures To Protect Against Employee Misconduct. ................... 6

    C.   Plaintiff's Allegations Regarding Alleged Misconduct Relating To Contracts With The United States Government. ..................................................... 7

        1.   The Rille Actions. ................................................................... 7

        2.   The HP Board responds to the Government's allegations............. 8

    D.   Plaintiff's Allegations Regarding Alleged Violations Of The FCPA By HP Personnel. ................................................................................. 9

ARGUMENT .................................................................................................................10

I.   STANDARD ON A MOTION TO DISMISS. ....................................................10

II.   THE COMPLAINT FAILS TO PLEAD FACTS SHOWING THAT THE DIRECTOR DEFENDANTS CONSCIOUSLY DISREGARDED HP'S AFFAIRS. ...................................................................................................10

    A.   Plaintiff Fails To Establish That Any Underlying Employee Misconduct Even Occurred. ....................................................................12

    B.   The Complaint Demonstrates That HP's Board Had Extensive Reporting And Compliance Procedures In Place. ...................................12

    C.   The Complaint Fails To Plead Facts Showing That The Director Defendants Consciously Failed To Monitor Or Oversee HP's Operations. ...................................................................................13

III.   PLAINTIFF'S CLAIMS REGARDING HURD'S COMPENSATION ARE
       MERITLESS AND SHOULD BE DISMISSED.................................................17

       A.    Corporate Directors Have Broad Discretion to Manage Corporate
             Affairs And Enjoy Substantial Immunities Related To Their Board
             Service.................................................................................................17

       B.    The Decision To Set Executive Compensation Is Protected By The
             Business Judgment Rule. ..................................................................19

             1.    The Director Defendants had no personal interest in the
                   setting of Hurd's compensation. ................................................19

             2.    Plaintiff has failed to rebut the presumption that the Director
                   Defendants acted in good faith in setting Hurd's
                   compensation. ..........................................................................20

IV.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS MERITLESS..................21

V.     THE DIRECTOR DEFENDANTS JOIN IN HP'S MOTION TO DISMISS.......23

CONCLUSION....................................................................................................23

# TABLE OF AUTHORITIES

**PAGE**

<u>CASES</u>

<u>Aronson v. Lewis</u>,
   473 A.2d 805 (Del. 1984) ................................................................... 2, 17

<u>Ash v. McCall</u>,
   No. Civ. A. 17132,
   2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ......................................... 18

<u>Bell Atlantic Corp. v. Twombly</u>,
   550 U.S. 544 (2007) ............................................................................... 10

<u>Cede & Co. v. Technicolor, Inc.</u>,
   634 A.2d 345 (Del. 1993) ...................................................................... 19

<u>Citron v. Fairchild Camera & Instrument Corp.</u>,
   569 A.2d 53 (Del. 1989) ................................................................... 17, 18

<u>Desimone v. Barrows</u>,
   924 A.2d 908 (Del. Ch. 2007) ...................................................... 11, 15, 18

<u>Gagliardi v. TriFoods International Inc.</u>,
   683 A.2d 1049 (Del. Ch. 1996) .............................................................. 18

<u>Graham v. Allis-Chalmers</u>,
   188 A.2d 125 (Del. 1963) ................................................................. 14, 15

<u>Grimes v. Donald</u>,
   673 A.2d 1207 (Del. 1996) ..................................................................... 19

<u>Guttman v. Huang</u>,
   823 A.2d 492 (Del. Ch. 2003) .......................................................... 11, 14

<u>In re Accuray, Inc. Shareholder Derivative Litigation</u>,
   757 F. Supp. 2d 919 (N.D. Cal. 2010) ................................................. 14, 22

<u>In re Baxter International, Inc. Shareholders Litigation</u>,
   654 A.2d 1268 (Del. Ch. 1995) .............................................................. 16

<u>In re Bidz.com, Inc. Derivative Litigation</u>,
   773 F. Supp. 2d 844,
   2011 WL 759461 (C.D. Cal. Feb. 24, 2011) ............................................ 14

<u>In re Caremark International Inc. Derivative Litigation</u>,
   698 A.2d 959 (Del. Ch. 1996).......................................................... <u>passim</u>

<u>In re Dow Chemical Co. Derivative Litigation</u>,
   Civ. A. No. 4349, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) ............................ 13, 14

<u>In re Intel Corp. Derivative Litigation</u>,
   621 F. Supp. 2d 165 (D. Del. 2009) ...................................... 11, 12, 15, 16

iv

*In re Lear Corp. Shareholder Litigation*,
   967 A.2d 640 (Del. Ch. 2008)...................................................................20

*In re RJR Nabisco, Inc. Shareholders Litigation*,
   Civ. No. 10389,
   1989 WL 7036 (Del. Ch. Jan. 31, 1989)..................................................20

*In re Silicon Graphics Inc. Securities Litigation*,
   183 F.3d 970 (9th Cir. 1999) ..........................................................2, 4, 17

*In re Stac Electronics Securities Litigation*,
   89 F.3d 1399 (9th Cir. 1996) ...................................................................4

*In re VeriFone Holdings, Inc. Shareholder Derivative Litigation*,
   Nos. C-07-6347 MHP, C-07-6140 MHP, 2010 WL 3385055
   (N.D. Cal. Aug. 26, 2010)........................................................................15

*In re VeriFone Securities Litigation*,
   11 F.3d 865 (9th Cir. 1993) .......................................................................4

*In re Walt Disney Co. Derivative Litigation*,
   906 A.2d 27 (Del. 2006) ...........................................................................20

*In re Walt Disney Co. Derivative Litigation*,
   907 A.2d 693 (Del. Ch. 2005)........................................................18, 19, 20

*Kanter v. Barella*,
   388 F. Supp. 2d 474 (D.N.J. 2005),
   *aff'd*, 489 F.3d 170 (3d Cir. 2009) ..........................................................11

*Lee v. Interinsurance Exchange*,
   50 Cal. App. 4th 694 (1996) ....................................................................18

*Levine v. Smith*,
   591 A.2d 194 (Del. 1991) .........................................................................18

*Lyondell Chemical Co. v. Ryan*,
   970 A.2d 235 (Del. 2009) ...................................................................18, 20

*Markewich v. Collins*,
   622 F. Supp. 2d 802 (D. Minn. 2009) ......................................................14

*Midwestern Teamsters Pension Trust Fund v. Baker Hughes Inc.*,
   No. H-08-1809, 2009 WL 6799492 (S.D. Tex. May 7, 2009)....................14

*Nemec v. Shrader*,
   Civil Action Nos. 3878-CC, 3934-CC,
   2009 WL 1204346 (Del. Ch. Apr. 30, 2009)............................................23

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Raines*,
   534 F.3d 779 (D.C. Cir. 2008) ......................................................15, 16, 19

*Reading Co. v. Trailer Train Co.*,
   No. 7422, 1984 WL 8212 (Del. Ch. Mar. 15, 1984) ................................18

Rudolph v. UTStarcom,
    560 F. Supp. 2d 880 (N.D. Cal. 2008).......................................................................4

Sherman v. Ryan,
    911 N.E.2d 378 (Ill. App. Ct. 2009).......................................................................22

Stone ex rel. AmSouth Bancorporation v. Ritter,
    911 A.2d 362 (Del. 2006) ............................................................................... passim

Total Care Physicians, P.A. v. O'Hara,
    No. Civ. A. 99C-11-201-JRS,
    2002 WL 31667901 (Del. Super. Ct. Oct. 29, 2002) ............................................22

White v. Panic,
    783 A.2d 543 (Del. 2001) ......................................................................................19

White v. Panic,
    793 A.2d 356 (Del. Ch. 2000),
    aff'd, 783 A.2d 543 (Del. 2001).............................................................................21

Wood v. Baum,
    953 A.2d 136 (Del. 2008) ......................................................................................14

Wood v. Coastal States Gas Corp.,
    401 A.2d 932 (Del. 1979) ......................................................................................23

**STATUTES**

8 Del. C. § 122(5)..............................................................................................................19

1
2
<u>**STATEMENT OF ISSUES**</u>

<u>**(N.D. CAL. CIVIL L.R. 7-4)**</u>

3     1.  Whether plaintiff fails to state a cause of action against defendants Marc L. Andreessen,

4   Lawrence T. Babbio, Sari M. Baldauf, Rajiv L. Gupta, John H. Hammergren, Joel Z. Hyatt, John R.

5   Joyce, Robert L. Ryan, Lucille S. Salhany and G. Kennedy Thompson (the "Director Defendants"),

6   present or former directors of nominal defendant Hewlett-Packard Company ("HP" or the

7   "Company"), for breach of fiduciary duty based an alleged failure of oversight where the

8   Complaint fails to plead facts demonstrating that the Director Defendants (i) did not implement

9   adequate reporting and compliance procedures to prevent employee misconduct at HP, or (ii) ever

10  knowingly, consciously or in bad faith disregarded those compliance and reporting procedures.

11     2.  Whether the Complaint fails to state a cause of action for breach of fiduciary duty

12  against the Director Defendants based on the allegedly excessive compensation paid to former HP

13  CEO Mark Hurd, where the Complaint does not contain specific factual allegations overcoming the

14  presumption of the exercise of business judgment by the HP Board in setting the level of Hurd's

15  compensation.

16     3.  Whether the Complaint fails to state a cause of action against the Director Defendants

17  for unjust enrichment based on their receipt of director fees, where the Complaint does not plead

18  facts showing that the Director Defendants failed to provide any services to HP and where HP was

19  contractually obligated to pay the Director Defendants fees for their board service.

20                        <u>**PRELIMINARY STATEMENT**</u>

21     The Director Defendants respectfully submit this motion to dismiss the Verified

22  Shareholder Derivative Complaint (the "Complaint") filed by plaintiff Saginaw Police and Fire

23  Pension Fund ("Plaintiff").  For the reasons articulated in the motion to dismiss concurrently filed

24  by nominal defendant HP, in which the Director Defendants join, the Complaint should be

25  dismissed because Plaintiff failed to make a demand on HP's Board prior to commencing this

26  litigation and has failed to plead particular facts excusing demand, as required by Federal Rule of

27  Civil Procedure 23.1.  The Director Defendants file this separate motion to dismiss under Federal

28  Rule of Civil Procedure 12(b)(6) to demonstrate that the Complaint should be dismissed with

1  prejudice for the additional reason that Plaintiff fails to plead facts sufficient to state any cause of

2  action against the Director Defendants.

3        This case is an improper hindsight attack by a shareholder upon a board of directors'

4  discretion to manage the business affairs of a corporation in accord with the business judgment rule,

5  which operates as a legal presumption that the Director Defendants acted on an informed basis, in

6  good faith and in the honest belief that the action taken was in the best interests of the Company.

7  Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).  Plaintiff asserts that the Director Defendants

8  lost the protection of the business judgment rule by breaching their fiduciary duty in two ways.

9  First, it claims that the Director Defendants failed to oversee adequately HP employees'

10  compliance with HP's legal obligations (a) in the procurement of contracts with the United States

11  Government for the sale of equipment and services and (b) in the alleged payment of bribes by HP

12  employees to Russian officials in 2001 to 2006.  Plaintiff claims that as a result of this alleged

13  failure HP employees exposed HP to liability for violations of the False Claims Act, the Anti-

14  Kickback Act, the Truth in Negotiations Act and the Foreign Corrupt Practices Act ("FCPA").

15  Second, Plaintiff claims that the Director Defendants should not have authorized compensation

16  payments to defendant Mark Hurd, HP's former CEO, during the period Hurd allegedly allowed

17  HP employees to violate federal law.  Neither theory states a claim under Delaware law.[1]

18        Plaintiff does not allege that the Director Defendants participated in any of the alleged

19  violations of law or knew of the alleged violations at the time they were occurring.  Instead,

20  Plaintiff asserts a failure of oversight claim, known as a "Caremark claim" after the leading case of

21  In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996).  This claim suffers from an

22  insurmountable obstacle.  To hold directors personally liable for damages for the conduct of

23  employees that allegedly harmed the corporation, Plaintiff must allege facts demonstrating that the

24  directors utterly failed to implement a reporting or information system or, if implemented,

25  consciously failed to monitor or oversee its operations.  In other words, liability requires that the

26  directors knew they were not discharging their fiduciary duties.  For this reason, a Caremark claim

27  _____

28  [1]      The substantive law of Delaware applies because HP is a Delaware corporation.  In re
Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 990 (9th Cir. 1999).

1 "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a

2 judgment."  <u>Caremark</u>, 698 A.2d at 967.

3        Plaintiff does not come close to pleading the facts required to establish a <u>Caremark</u> claim.

4 Although Plaintiff alleges that HP paid $55 million to the Government to settle claims with respect

5 to domestic contracting policies, Plaintiff overlooks that in the stipulated settlement agreement

6 attached to the Complaint HP specifically disclaimed any liability.  Indeed, the Complaint admits

7 that, far from ignoring its oversight responsibility, once the HP Board was informed of the

8 Government's allegations with respect to HP's domestic contracting practices, it did exactly what a

9 prudent and cautious board should do if confronted with this information:  <u>it immediately engaged</u>

10 <u>outside experts to investigate the claims</u>.  (Compl. ¶84.)  Similarly, with respect to the FCPA

11 claims concerning alleged bribes paid in Russia, which was first brought to the Director

12 Defendants' attention in December 2009, investigations by government authorities in Germany,

13 Russia and the United States are ongoing and there has been no finding of wrongdoing by HP.

14 Plaintiff admits that HP is cooperating with those investigations.  Plaintiff cannot state a <u>Caremark</u>

15 claim by relying solely on the inference that because HP employees allegedly engaged in

16 misconduct, the Director Defendants must be responsible.  Such a theory simply ignores the reality

17 that a director cannot be expected to know everything that each of 300,000 employees in a

18 multinational corporation is doing in real time.

19        Not only does Plaintiff fail to plead facts establishing a conscious disregard of oversight

20 duties by the HP Board, but Plaintiff also pleads itself right out of any <u>Caremark</u> claims.  The

21 Complaint details the extensive reporting and compliance procedures HP adopted to prevent

22 employee misconduct and to bring such misconduct to the Board's attention.  Plaintiff's Complaint

23 notes that HP had a written policy in place, known as its Standards of Business Conduct ("SBC"),

24 that explicitly prohibited the payment of bribes or kickbacks, which is the very type of employee

25 misconduct alleged here.  The Complaint also notes that the HP Board received regular reports

26 from at least two different senior management committees regarding employee compliance with

27 HP's business conduct standards, but fails to allege that any member of these committees ever

28 informed the Board of any potential issues or "red flags" regarding HP's compliance with proper

1  contracting practices domestically or in Russia.  Finally, the Complaint acknowledges that the

2  Board's Audit Committee, made up of outside directors, is responsible for overseeing HP's

3  compliance with its SBC.  Plaintiff does not allege that the Audit Committee failed to hold

4  meetings or otherwise ignored this obligation.

5        Plaintiff also asserts that the Director Defendants breached their fiduciary duties by

6  overcompensating HP's former CEO Hurd and that the Board was unjustly enriched through the

7  receipt of director fees.  Both of these claims are meritless and should be dismissed.  Plaintiff's

8  assertion that the HP Board overcompensated Hurd fails because officer compensation is a decision

9  protected by the business judgment rule.  Plaintiff fails to plead any facts that would overcome this

10 strong presumption that the HP Board acted properly in setting Hurd's compensation.  Plaintiff also

11 fails to plead any facts sufficient to overcome the limited liability provisions of HP's charter

12 provision adopted under Section 102(b)(7) of the Delaware General Corporation law.  That charter

13 provision shields directors from liability for monetary damages except for acts committed in bad

14 faith or in breach of the directors' duty of loyalty, neither of which is alleged here.  Finally, the

15 unjust enrichment claim fails because HP was contractually obligated to pay fees to its directors

16 and Plaintiff fails to plead any facts showing that the Director Defendants did not provide services

17 to HP in return for those fees.

18 I.    **STATEMENT OF FACTS.**[2]

19    A.    **The Parties.**

20        1.    **Nominal Defendant HP.**

21        Nominal defendant HP is a corporation organized and existing under the laws of the State

22 of Delaware.  (Compl. ¶18.)  HP is a global provider of products, technologies, software, solutions

23

24 _____

[2]        These facts are taken from the well pleaded allegations of the Complaint, which the Court
must accept as true.  The Court is not required to assume the truth of legal conclusions or
25 unwarranted factual inferences.  See In re VeriFone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993).
The Court may also consider documents submitted in support of the motion that are referenced in
26 the Complaint, even if not physically attached to the pleading, as well as matters that may be
judicially noticed.  Silicon Graphics, 183 F.3d at 986; In re Stac Elecs. Sec. Litig., 89 F.3d 1399,
27 1405 n.4 (9th Cir. 1996) (considering full text of prospectus, including portions not mentioned in
the complaint); see also Rudolph v. UTStarcom, 560 F. Supp. 2d 880, 887 (N.D. Cal. 2008)
28 ("Under certain circumstances, the court may also consider matters that are appropriate subjects of
judicial notice under Federal Rule of Evidence 201.").

1  and services to individual consumers and businesses.  (Id.)  HP's shares are traded on the New

2  York Stock Exchange.  (Id. ¶18.)  As is the case with many publicly-traded Delaware corporations,

3  HP has adopted a charter provision under Section 102(b)(7) of the Delaware General Corporation

4  Law exculpating its directors from liability for monetary damages for any alleged breaches of the

5  fiduciary duty of care.  (Horvath Decl. Ex. B, at Art. X.A.)

6          **2.**     **The Outside Directors of HP.**

7        Defendants Andreessen, Babbio, Baldauf, Gupta, Hammergren, Hyatt, Joyce, Ryan,

8  Salhany and Thompson (the "Director Defendants") comprised HP's Board of Directors when the

9  Complaint was filed on October 19, 2010.  (Compl. ¶¶19-29.)  Each of the Director Defendants has

10  not been employed by HP and has been independent under NYSE listing standards.  (Horvath Decl.

11  Ex. A, at 17-18.)  Four of these directors – Andreessen, Gupta, Hyatt and Joyce – joined the HP

12  Board in or after 2007, after the alleged payment of bribes by three HP employees to Russian

13  governmental officials alleged in the Complaint.  (Compl ¶¶10, 19, 22, 24 & 25.)  The Complaint

14  alleges that each Director Defendant was compensated for his or her service on the HP Board.  (Id.

15  ¶¶19-28.)

16          **3.**     **Mark Hurd.**

17        Defendant Mark Hurd served as HP's Chief Executive Officer from 2005 until his

18  resignation in August 2010.  (Compl. ¶34.)  Hurd also served as Chairman of HP's Board of

19  Directors from September 2006 until August 2010.  (Id.)  HP grew during Hurd's tenure as CEO.

20  For the fiscal year ending October 31, 2005, HP had 150,000 employees, net revenue of $86.696

21  billion and net earnings of $2.398 billion.  (Horvath Decl. Ex. C at 15, 31 & 34.)  For the fiscal

22  year ending October 31, 2010, HP had grown to 324,600 employees, net revenue increased to

23  $126.033 billion and net earnings increased by more than 350% to $8.761 billion.  (Horvath Decl.

24  Ex. D at 15 & 35.)  HP's stock price also increased during Hurd's tenure, as demonstrated by HP's

25  market capitalization increasing from approximately $57.3 billion on March 28, 2005, the day

26  before Hurd joined HP, to approximately $108.2 billion on August 5, 2010, the day before Hurd's

27  separation from HP was announced.  (See Horvath Decl. ¶¶10 & 11 and Exs. E, F, G & H.)

28

B.   **Plaintiff's Complaint Establishes That HP Had Extensive Reporting And Compliance Procedures To Protect Against Employee Misconduct.**

Although Plaintiff seeks to hold the Director Defendants liable for the alleged misconduct of HP personnel under a theory that the Director Defendants disregarded their oversight duties, Plaintiff's Complaint actually details the extensive procedures in place at HP to prevent employee misconduct and bring any misconduct to the Board's attention.  As explained in the Complaint, HP has a written code of conduct, the SBC.  (Compl. ¶¶47-50.)  The SBC explicitly states that HP employees must not "offer or provide bribes or kickbacks to win business or to influence a business decision – anywhere on anything."  (Id. ¶49.)  Plaintiff also admits that the Board has adopted Corporate Governance Guidelines, which among other things states that "The Board also expects directors, officers and employees to acknowledge their adherence to the Standards of Business Conduct on an annual basis."  (Id. ¶¶51 & 53.)

HP's Board also received regular reports regarding ethics and compliance issues from two separate management committees, consisting of some of HP's most senior officers.  For example, HP's Board received annual and semi-annual reports from an Ethics and Compliance Committee.  (Compl. ¶54.)  The Ethics and Compliance Committee consisted of a Chief Ethics and Compliance Officer, the Controller, the Executive Vice President of Human Resources, the General Counsel, the CFO and at least one senior executive liaison to a business unit.  (Id.)  One of the Ethics and Compliance Committee's responsibilities is overseeing compliance with applicable laws and regulations.  (Id.)  Nowhere does Plaintiff allege that the Ethics and Compliance Committee, or any member of that committee, either during one of its annual or semi-annual reports to the Board, or at any other time, informed the Director Defendants that:

- HP had compliance issues with respect to its domestic contracting practices with the United States Government prior to 2007; or

- Prior to December 2009, HP had FCPA compliance issues with respect to its contracting practices in Russia (or anywhere else).

In addition to receiving reports from the Ethics and Compliance Committee, HP's Board also received semi-annual and annual reports from HP's Compliance Committee.  (Compl. ¶55.)

6

1    The Compliance Committee, like the Ethics and Compliance Committee, is not staffed with low-

2    level managers with little or no authority, but instead consists of high ranking HP executives.

3    Members of the Compliance Committee include the Chief Ethics and Compliance Officer, the

4    Chief Privacy Officer, the VP of Internal Audit, the Deputy GC for Corporate and Securities M &

5    A, the Director of Compliance and liaisons between the Compliance Council and HP's business

6    units.  (Id.)  Plaintiff fails to allege that any member of the Compliance Committee, either during

7    one of its annual or semi-annual reports to the Board, or at any other time, informed the Director

8    Defendants that HP might have compliance issues with respect to its domestic contracting practices

9    with the United States Government prior to 2007 or FCPA compliance issues with respect to its

10   contracting practices in Russia (or anywhere else).

11        As Plaintiff admits, the HP Board's Audit Committee, consisting entirely of outside

12   directors, monitors the internal controls and compliance procedures HP put in place.  (Compl. ¶¶30

13   & 56-57.)  According to the Audit Committee's Charter, the Audit Committee "will review the

14   adequacy and effectiveness of HP's internal controls," (id. ¶56) and "will oversee HP's ethics and

15   compliance programs with respect to legal and regulatory requirements, and review with

16   management and the Director of Internal Audit the results of their review of compliance with

17   applicable laws, regulations and listing standards [and] HP's Standards of Business Conduct. . . ."

18   (Id. ¶57.)  Plaintiff does not contend that the Audit Committee failed to meet or otherwise failed to

19   undertake the responsibilities assigned to it by its Charter.

20        **C.    Plaintiff's Allegations Regarding Alleged Misconduct Relating To Contracts
21               With The United States Government.**

22             **1.    The Rille Actions.**

23        According to Plaintiff's Complaint, in late 2006/early 2007, the United States Government

24   notified HP of the fact that certain *qui tam* plaintiffs had alleged that HP and other entities had

25   engaged in domestic contracting practices with the federal government that allegedly violated

26   various federal statutes, including the False Claims Act, the Anti-Kickback Act and Truth in

27   Negotiations Act.  (Compl. ¶¶84-85.)  (These *qui tam* actions are referred to in this document as the

28   "Rille Actions.")  Plaintiff does not allege that HP or any member of its Board was ever made

1  aware of any potential False Claim Act, Anti-Kickback Act or Truth in Negotiations Act violations

2  prior to the Government informing HP of the allegations being made by the <u>Rille</u> plaintiffs.

3  Plaintiff also does not allege that HP had any prior compliance issues that would put HP's Board

4  on notice that HP might have legal issues with its contracting practices with the United States

5  Government.

6          According to Plaintiff's Complaint, in April 2007, the United States filed a Complaint in

7  Intervention in the <u>Rille</u> Actions alleging False Claims Act and Anti-Kickback Act claims against

8  HP.  (Compl. ¶85.)  Plaintiff alleges that the Government asserted that HP and other information

9  technology vendors formed improper "alliances" with technology "systems integrators," such as

10 Accenture LLP, which had been retained by the Government to advise it regarding the selection of

11 information technology vendors to provide products and services.  (<u>Id.</u> ¶67.)  The Government

12 alleged that HP paid fees, in the form of referral fees, commissions and free or discounted products

13 and services, to these systems integrators when the Government awarded contracts to HP at the

14 recommendation of the systems integrator and that such payments were unlawful.  (<u>Id.</u> ¶¶68-69.)

15         Plaintiff also alleges that the <u>Rille</u> plaintiffs asserted that Hurd was personally involved in

16 the various contracting programs under which systems integrators were paid improper fees, both in

17 his prior role as an executive of NCR and later as HP's CEO.  (Compl. ¶¶83-84.)  Plaintiff does not

18 allege that Hurd ever brought these alleged practices to the attention of the Director Defendants at

19 any time.  Plaintiff also does not allege that the existence of such practices was ever brought to the

20 attention of the Director Defendants by any other person or entity prior to the time the Government

21 informed HP of the allegations sometime in late 2006/early 2007.  Indeed, Plaintiff appears to

22 contend that some of the Defendant Directors learned of the allegations in the <u>Rille</u> Actions

23 through HP's filings with the SEC in June 2007 and December 2007 – well after the alleged

24 misconduct prompting the <u>Rille</u> Actions occurred.  (<u>Id.</u> ¶88.)

25              1.      **The HP Board responds to the Government's allegations.**

26         The Complaint demonstrates that immediately after the Government informed HP of the

27 allegations of the <u>Rille</u> plaintiffs, the HP Board did exactly what a prudent Board would do in those

28 circumstances.  In February 2007, HP informed the Government that it had retained outside

8

1   consultants to investigate HP's contracting practices.  (Compl. ¶¶84-85.)  Nowhere does Plaintiff

2   allege that these consultants ever informed the Director Defendants of potential compliance

3   problems on HP contracts anytime during the 2002 to 2007 time period.  Plaintiff also does not

4   allege that the Director Defendants ever ignored any advice from these consultants regarding HP's

5   compliance systems or contracting practices.

6         HP settled the claims in the <u>Rille</u> Actions with the Government in August 2010, prior to any

7   trial or other adjudication of those claims.  (Compl. Ex. A. ¶8.)  That settlement agreement,

8   attached to the Complaint, contained a paragraph indicating that the Government contended that

9   HP had violated federal law with respect to government contracts in the 2002-09 timeframe, *but*

10  *also a paragraph indicating that HP was not admitting liability with respect to any of the*

11  *Government's contentions and that "[n]either this Settlement Agreement, its execution, nor the*

12  *performance of any obligation under it, including any payment, is intended to be, or shall be*

13  *understood as, an admission of liability or wrongdoing, or other expression reflecting upon the*

14  *merits of the dispute by HP."*  (<u>Id.</u>, Ex. A ¶¶D & E.) (emphasis added.)  To date, there has never

15  been any finding by any court that HP employees engaged in the violations asserted by the <u>Rille</u>

16  plaintiffs.

17        **D.    Plaintiff's Allegations Regarding Alleged Violations Of The FCPA By HP**
18               **Personnel.**

19        Plaintiff alleges that HP learned in December 2009 that personnel at a former HP German

20  subsidiary had been arrested by German and Swiss authorities for allegedly paying bribes to certain

21  Russian officials from 2001 through 2006 in connection with the procurement of a contract in

22  Russia.  (Compl. ¶¶10, 95, 97-98 & 101.)  Plaintiff does not allege that the Director Defendants

23  were ever aware of any alleged FCPA violations by HP personnel prior to December 2009.

24  Plaintiff also does not allege any facts suggesting that the Director Defendants should have been

25  aware of any potential FCPA compliance issues prior to the arrest of these individuals in December

26  2009.  HP publicly disclosed in September 2010 the Government's investigation into the

27  allegations of potential FCPA violations and, as Plaintiff admits, HP is cooperating with that

28

1   investigation.  (Id. ¶¶101-103.)  To date, there has not been any finding by any court that HP

2   employees violated the FCPA with respect to this contract.

3                                              **ARGUMENT**

4   **I.        STANDARD ON A MOTION TO DISMISS.**

5            The standard for granting a motion to dismiss under Federal Rule of Civil Procedure

6   12(b)(6) is settled:  a complaint must be dismissed if it fails to plead "enough facts to state a claim

7   to relief that is plausible on its face."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

8   Moreover, the alleged facts "must be enough to raise a right to relief above the speculative level."

9   <u>Id.</u>, 550 U.S. at 555.  While all material allegations in a complaint must be accepted as true, the

10  Court need not accept wholly conclusory allegations and "a formulaic recitation of the elements of

11  a case of action will not do."  <u>Id.</u>  This last admonition has particular relevance here, where the

12  Complaint eschews factual allegations in favor of unsupported conclusory allegations and

13  inferences that are not permitted by applicable law.

14  **II.       THE COMPLAINT FAILS TO PLEAD FACTS SHOWING THAT THE
            DIRECTOR DEFENDANTS CONSCIOUSLY DISREGARDED HP'S AFFAIRS.**

15

16           Delaware law sets a high bar for a plaintiff seeking to plead claims against a corporate

17  board based on an alleged breach of its duty to oversee the corporation's affairs.  Plaintiff's

18  oversight claims are based upon two separate and distinct acts of alleged misconduct by HP

19  employees: (i) allegations of misconduct regarding contracts with the US Government in the 2002

20  to 2009 timeframe, and (ii) allegations of alleged FCPA violations by employees of a former HP

21  subsidiary with respect to a contract in Russia from 2001 to 2006.  (Compl. ¶¶9-10, 101, 105, 106

22  & 109.)  Importantly, the Complaint does not allege that any Director Defendant personally

23  participated in this alleged misconduct.  (<u>Id.</u>)  For example, there is no allegation that any director

24  personally submitted a false claim to the United States government or personally bribed a Russian

25  official.  (<u>Id.</u>)  Instead, the Complaint makes conclusory allegations that the Director Defendants

26  consciously allowed this misconduct to occur.  (<u>Id.</u> ¶¶1, 8-11, 105-106 & 109.)  These allegations

27

28

                                                  10

1   are insufficient to state a claim against the Director Defendants for breach of their oversight duties

2   with respect to both instances of alleged misconduct.[3]

3        A Caremark claim is a type of *non-feasance* claim in which a shareholder plaintiff alleges

4   that a board of directors failed in its general duty to monitor the corporation's affairs, permitting

5   others to engage in misconduct.  Caremark claims cannot be premised on negligence, recklessness

6   or the general allegation that the board was merely "asleep at the switch," but instead require a

7   showing of a *conscious* abdication of duties.  Desimone v. Barrows, 924 A.2d 908, 940 (Del. Ch.

8   2007) (Caremark liability requires a complaint to allege facts showing that directors knew they

9   were not discharging their duties).

10       The Delaware Supreme Court has stated that a Caremark claim exists only if the

11   allegations show "(a) the directors *utterly failed* to implement any reporting or information system

12   or controls; or (b) having implemented such a system or controls, *consciously failed to monitor* or

13   oversee its operations thus disabling themselves from being informed of risks or problems

14   requiring their attention.  In either case, imposition of liability requires a showing that *the directors*

15   *knew that they were not discharging their fiduciary obligations*."  Stone ex rel. AmSouth

16   Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006) (emphasis added).  This two-pronged

17   standard promotes the valuable goal of Delaware law that makes "board service by qualified

18   persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by

19   such directors."  Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003).

20

21

---

22   [3]      The claims against Director Defendants Andreessen, Gupta, Joyce and Hyatt regarding the
     alleged FCPA violations are deficient on their face for an additional reason.  Hyatt and Joyce
23   joined the HP Board in 2007 and Andreessen and Gupta joined the HP Board in 2009.  (Compl.
     ¶¶19, 22 & 24-25.)  However, Plaintiff alleges that the FCPA violations occurred in connection
24   with a transaction that spanned 2001 through 2006 between a former HP German subsidiary and
     the Russian government.  (Id. ¶¶10, 95 & 101.)  Director Defendants Andreessen, Gupta, Hyatt and
25   Joyce therefore face no liability for the alleged FCPA violations which occurred before they joined
     the HP Board.  See, e.g., In re Intel Corp. Deriv. Litig., 621 F. Supp. 2d 165, 175 (D. Del. 2009)
26   (directors did not face liability for Caremark claim based on purported employee misconduct
     occurring years before nine defendants joined the Intel board); Kanter v. Barella, 388 F. Supp. 2d
27   474, 480 (D.N.J. 2005), aff'd, 489 F.3d 170 (3d Cir. 2009) (dismissing Caremark claim for failure
     to establish a substantial likelihood of director liability to excuse pre-suit demand where complaint
28   acknowledged at least three defendants were not directors when the challenged conduct occurred).

11

**A.    Plaintiff Fails To Establish That Any Underlying Employee Misconduct Even Occurred.**

As a preliminary matter, Plaintiff's Complaint fails to establish that any underlying misconduct by HP employees has occurred.  With regard to the <u>Rille</u> Actions, Plaintiff fails to bring to the Court's attention that HP specifically disclaimed any liability or wrongdoing.  (Compl. Ex. A at 2-3.)  Moreover, as Plaintiff admits in the Complaint (<u>id.</u> ¶¶100-103), the allegations regarding FCPA violations by employees of a former HP subsidiary are still in the nascent investigatory stage.  Thus, there has been no finding that HP employees have even engaged in the wrongdoing alleged in the <u>Rille</u> Actions or in any FCPA violations.

As demonstrated below, even assuming that HP employees have violated federal law, that would not in any way establish a <u>Caremark</u> claim against HP's directors.  Plaintiff's <u>Caremark</u> claims are however especially weak and misguided in light of the fact that no underlying violation of law has been established.  <u>See</u> <u>In re Intel</u>, 621 F. Supp. 2d at 175 (allegations regarding an ongoing governmental investigation "contribute little, if anything, towards establishing that the Directors now face a 'substantial likelihood' of liability for having" failed to exercise their oversight duties).

**B.    The Complaint Demonstrates That HP's Board Had Extensive Reporting And Compliance Procedures In Place.**

The Complaint does not plead facts satisfying the first prong of a <u>Caremark</u> claim:  that the Director Defendants failed to implement internal controls at HP.  Indeed, the Complaint admits the opposite.  The Complaint alleges that HP has a written code of conduct, the SBC, that explicitly prohibits bribery.  (Compl. ¶¶47-49.)  HP also had in place various committees that regularly reported to the Board regarding ethics and compliance issues at HP.  These included annual and semi-annual reports from an Ethics and Compliance Committee consisting of a Chief Ethics and Compliance Officer, the Controller, the Executive Vice President of Human Resources, the General Counsel, the CFO and at least one senior executive liaison to a business unit.  (<u>Id.</u>)  The Board also received semi-annual and annual reports from HP's Compliance Committee, a separate committee consisting of the Chief Ethics and Compliance Officer, the Chief Privacy Officer, the

1   VP of Internal Audit, the Deputy GC for Corporate and Securities M & A, the Director of

2   Compliance and liaisons between the Compliance Council and HP's business units.  (Id. ¶55.)

3        The Complaint therefore fails to state a Caremark claim on the basis that the directors

4   "utterly failed to implement any reporting or information system or control."  Stone, 911 A.2d at

5   370.  As courts have frequently held, a Caremark claim cannot be premised on a failure to

6   implement a system of controls where the Complaint concedes the existence of such a system, as

7   well as policies meant to deter employee wrongdoing.  See Stone, 911 A.2d at 371-72 (Caremark

8   claim could not "withstand a motion to dismiss" where board had policies and procedures in place

9   regarding compliance with the Bank Secrecy Act); see also In re Dow Chem. Co. Deriv. Litig., Civ.

10  A. No. 4349, 2010 WL 66769, *13 n.85 (Del. Ch. Jan. 11, 2010) (plaintiffs could not state a

11  Caremark claim against Dow's directors for alleged bribes paid by Dow where Dow had a code of

12  ethics prohibiting bribes).

13       **C.**   **The Complaint Fails To Plead Facts Showing That The Director Defendants**
14            **Consciously Failed To Monitor Or Oversee HP's Operations.**

15       By conceding HP had internal controls, Plaintiff faces the even more difficult task of

16  pleading facts satisfying the second prong of a Caremark claim:  that the Director Defendants

17  *consciously* failed to monitor those internal controls or failed to act in the face of known "red

18  flags."  Stone, 911 A.2d at 370 (where controls have been implemented, Caremark claim requires a

19  showing that directors "*consciously failed to monitor* or oversee its [the Company's] operations").

20  But Plaintiff has not pled any facts showing the Director Defendants consciously failed to monitor

21  or oversee HP's extensive internal controls.  Moreover, Plaintiff has not identified *any* red flags

22  that were presented to the Director Defendants, much less red flags that they consciously ignored.

23       The Delaware Supreme Court's opinion in Stone is instructive.  In Stone, the court affirmed

24  the dismissal of a shareholder derivative claim for failure to make demand on the board predicated

25  on allegations that the AmSouth Board failed in its oversight obligations, where AmSouth incurred

26  $40 million in government fines for employee violations of the Bank Secrecy Act ("BSA") and a

27  $10 million civil penalty for operating an inadequate anti-money-laundering ("AML") program.  Id.

28  at 365-66.  The court noted that, even though violations of law occurred, the directors had

13

1  established an information and reporting system that "was designed to permit the directors to

2  periodically monitor AmSouth's compliance with BSA and AML regulations." Id. at 371-72.  The

3  court held that, "[i]n the absence of red flags, good faith in the context of oversight must be

4  measured by the directors' actions to 'assure a reasonable information and reporting system exists'

5  and not by second-guessing after the occurrence of employee conduct that results in an unintended

6  adverse outcome." Id. at 373 (quoting Caremark, 698 A.2d at 967-68, 971).  "The lacuna in the

7  plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight

8  responsibility may not invariably prevent employees from violating criminal laws, or from causing

9  the corporation to incur significant financial liability, or both, as occurred in Graham, Caremark

10  and this very case." Id.  See also In re Dow, 2010 WL 66769, at *13 (Caremark claim could not be

11  supported against Dow's directors even where plaintiff pled sufficient facts establishing that Dow's

12  employees paid illegal bribes); Midwestern Teamsters Pension Trust Fund v. Baker Hughes Inc.,

13  No. H-08-1809, 2009 WL 6799492, at *8 (S.D. Tex. May 7, 2009) (Caremark claims predicated on

14  FCPA violations could not be asserted where Baker Hughes had procedures in place designed to

15  prevent FCPA violations, including a Business Code of Conduct and an FCPA policy).

16          Just as plaintiffs failed to do in Stone, Plaintiff here does not plead facts satisfying the

17  second Caremark prong because it "does not plead a single fact suggesting specific red – or even

18  yellow – flags were waved at the outside directors." Guttman, 823 A.2d at 507; see also

19  Markewich v. Collins, 622 F. Supp. 2d 802, 811 (D. Minn. 2009) ("'Red flags are only useful when

20  they are either waved in one's face or displayed so that they are visible to the careful observer.'")

21  (quoting Wood v. Baum, 953 A.2d 136, 143 (Del. 2008)); In re Dow, 2010 WL 66769, *13 n.85 (in

22  attempting to state a Caremark claim, plaintiffs "cannot simultaneously argue that the Dow board

23  'utterly failed' to meet its oversight duties yet had 'corporate governance procedures' in place

24  without alleging that the board failed to monitor its ethics policy or its internal procedures").[4]  The

---

25  [4]      See also In re Bidz.com, Inc. Deriv. Litig., 773 F. Supp. 2d 844, 2011 WL 759461, *8 (C.D.
26  Cal. Feb. 24, 2011) (dismissing Caremark claim for failure to excuse demand where "[t]here is
   nothing suggesting that the Board was ever presented with these 'red flags'"); In re Accuray, Inc.
27  S'holder Deriv. Litig., 757 F. Supp. 2d 919, 928 (N.D. Cal. 2010) (plaintiffs failed to excuse
   demand on Caremark claim where "Plaintiffs have not alleged any specific information that each
   director knew and ignored concerning" the Company's accounting methods); In re Intel, 621 F.
28  Supp. 2d at 174 (plaintiff failed to plead that directors faced a substantial likelihood of liability for

*(cont'd)*

14

1  Complaint's silence as to what red flags the Director Defendants knew of <u>and</u> ignored is fatal to

2  Plaintiff's <u>Caremark</u> claim.

3        Nor can Plaintiff claim that the Director Defendants knew of, and ignored, the alleged

4  employee misconduct merely because it may have occurred.  <u>See</u> <u>Desimone</u>, 924 A.2d 908, 940

5  (Del. Ch. 2007) ("Delaware courts routinely reject the conclusory allegation that because illegal

6  behavior occurred, internal controls must have been deficient, and the board must have known

7  so.").  Indeed, the court in <u>Caremark</u> refused to equate employee wrongdoing with director liability

8  for breach of the duty of oversight in a situation where the corporation *pled guilty to federal*

9  *criminal acts* and paid $250 million in criminal fines and civil penalties.  <u>Caremark</u>, 698 A.2d at

10  972 (noting "[t]he liability that eventuated in this instance was huge.  But the fact that it resulted

11  from a violation of criminal law alone does not create a breach of fiduciary duty by directors").

12  Plaintiff leaves the Court to draw the inference that, merely because HP employees may have

13  engaged in wrongful conduct and exposed HP to liability by their actions (which, unlike in

14  <u>Caremark</u>, has not been admitted here), the Director Defendants must have breached their fiduciary

15  duty.  This inference is not permissible.  <u>Stone</u>, 911 A.2d at 373 (refusing "to equate a bad outcome

16  with bad faith").[5]

17        Plaintiff also cannot demonstrate that the Director Defendants knew of <u>and</u> ignored

18  employee misconduct <u>when that conduct occurred</u> by claiming that the Director Defendants later

19  knew of the allegations in the <u>Rille</u> Actions or the Government's investigation into alleged FCPA

20  violations.  (<u>See</u> Compl. ¶¶87-88 & 98.)  A director's knowledge of alleged employee wrongdoing

21

_____

22  *(cont'd from previous page)*
  oversight claim where "Plaintiff fails to identify what the Directors actually knew about the 'red

23  flags' and how they responded to them").

  [5]     <u>See also</u> <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines</u>, 534 F.3d 779,

24  782, 789 (D.C. Cir. 2008) (Fannie Mae directors did not face a substantial likelihood of liability for
  <u>Caremark</u> claims despite court recognition that "Fannie Mae announced one of the largest earnings

25  restatements in U.S. history"); <u>In re VeriFone Holdings, Inc. S'holder Deriv. Litig.</u>, Nos. C-07-
  6347 MHP, C-07-6140 MHP, 2010 WL 3385055, at *10 (N.D. Cal. Aug. 26, 2010) (directors did

26  not face a substantial likelihood of liability on <u>Caremark</u> claims despite accounting irregularities
  that necessitated a restatement of corporation's financial results); <u>Graham v. Allis-Chalmers</u>,

27  188 A.2d 125, 131 (Del. 1963) (upholding decision that, as a matter of law, directors could not be
  liable "merely because, unknown to [the directors], some employees . . . violated the anti-trust laws

28  thus subjecting the corporation to loss").

1  after the wrongdoing occurred does not show that a director knew of and ignored that misconduct

2  while it was occurring.  See In re Intel, 621 F. Supp. 2d at 174 (complaint did not allege facts

3  showing the directors faced a substantial likelihood of liability for knowing and ignoring alleged

4  anti-trust violations as they were occurring where only alleged "red flag" was the directors

5  approved later SEC filings disclosing investigations into the alleged violations).

6      It is also worth noting that the Director Defendants have been all "non-executive" or

7  "outside" members of HP's Board, meaning that none of them was actually a full-time employee

8  working at HP.  As explained in the seminal case in this area, "[m]ost of the decisions that a

9  corporation, acting through its human agents, makes are, of course, not the subject of director

10  attention.  Legally, the board itself will be required only to authorize the most significant corporate

11  acts or transactions . . . ."  Caremark, 698 A.2d at 968.  Given that HP is a massive global entity

12  with hundreds of thousands of employees, it simply defies common sense to leap to the conclusion,

13  as Plaintiff asks this Court to do, that outside board members should be held liable for allegedly

14  illegal payments by HP employees unknown to the Director Defendants at the time they were made.

15      Finally, the Complaint fails to allege that the Board ever ignored danger signs or "red flags"

16  indicating employee misconduct.  To the contrary, the Complaint demonstrates that the HP Board

17  promptly hired an outside consultant to launch its own investigation, (Compl. ¶84), and that the

18  Company has chosen to cooperate with governmental investigations.  (See id. ¶103.)  Plaintiff does

19  not allege what else the Board should have done in these circumstances.  Plaintiff therefore fails to

20  allege any facts showing that the Board knowingly failed to act on a potential red flag, as required

21  in Stone.  See also Pirelli, 534 F.3d at 789 ("Plaintiffs' own allegations demonstrate[d] that the

22  directors actually responded to each of the 'red flags' cited by plaintiffs" where "on each claim, the

23  Board or its relevant committee looked into the matter and relied on internal or external accounting

24  experts.") (citation omitted); In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del. Ch.

25  1995) (complaint failed to plead facts showing that directors faced a substantial likelihood of

26  liability for oversight claim where, "without an allegation that wrongdoing was admitted or proven,

27  the complaint does not plead with particularity what obvious danger signs were ignored or what

28  additional measures the directors should have taken").

16

1    Plaintiff has therefore failed to meet the legal requirements for pleading <u>Caremark</u> claims

2  and the Court should dismiss the claims alleged in Count I.

3  **III.   PLAINTIFF'S CLAIMS REGARDING HURD'S COMPENSATION ARE**
        **MERITLESS AND SHOULD BE DISMISSED.**

4

5    Plaintiff also alleges that the Director Defendants improperly awarded Hurd approximately

6  $97 million in compensation payments from 2007 through 2009.  (Compl. ¶106.)  Plaintiff claims

7  that Hurd's compensation was excessive because Hurd allegedly made a conscious decision to

8  allow HP employees to violate the False Claims Act, the Anti-Kickback Act and the FCPA.  (<u>Id.</u>

9  ¶109.)  This allegation fails to state a claim.[6]

10   **A.   Corporate Directors Have Broad Discretion To Manage Corporate Affairs And**
         **Enjoy Substantial Immunities Related To Their Board Service.**

11

12   In order to ensure that capable, qualified persons serve on corporate boards, the law

13  provides substantial legal protections and immunities to directors when their actions are challenged

14  by shareholders.  The most well know of these is the business judgment rule, which "operates as a

15  procedural guide for litigants and a substantive rule of law."  <u>Citron v. Fairchild Camera &</u>

16  <u>Instrument Corp.</u>, 569 A.2d 53, 64 (Del. 1989).

17   First, the business judgment rule presumes that directors act "on an informed basis, in good

18  faith and in the honest belief that the action was in the best interests of the company."  <u>Citron</u>, 569

19  A.2d at 64 (quoting <u>Aronson</u>, 473 A.2d at 812); <u>see also</u> <u>In re Silicon Graphics Inc. Secs. Litig.</u>,

20  183 F.3d 970, 990 (9th Cir. 1999) ("Under the business judgment rule, directors are presumed to

21  make sound business decisions, and to inform themselves properly prior to making those

22  decisions.").  This presumption automatically attaches to any "director-approved transaction within

23  a board's conferred or apparent authority in the absence of any evidence of 'fraud, bad faith, or

24  self-dealing in the usual sense of personal profit or betterment.'"  <u>Citron</u>, 569 A.2d at 64 (citation

25  omitted).  To overcome this presumption, the Complaint must allege facts showing that each

26  director breached his or her fiduciary duty of loyalty or good faith, failed to exercise due care, or

27  ───────────
     [6]    As noted in footnote 3, above, Director Defendants Andreessen and Gupta joined the HP
28  Board in 2009.  (<u>See also</u> Compl. ¶¶19 & 22.)  Accordingly, Andreessen and Gupta face no
     liability for compensation awarded to Hurd in 2007 and 2008.

1  that the challenged action constituted waste.  See id. ("The burden falls on the proponent of a claim

2  to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing,

3  or that the directors either lacked good faith or failed to exercise due care."); see also In re Walt

4  Disney Co. Deriv. Litig., 907 A.2d 693, 747 (Del. Ch. 2005) ("Disney I") ("Where a plaintiff fails

5  to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal

6  or equitable, unless the transaction constitutes waste."); Lee v. Interinsurance Exch., 50 Cal. App.

7  4th 694, 715 (1996) (affirming grant of demurrer and noting that "in most cases, the presumption

8  created by the business judgment rule can be rebutted only by affirmative allegations of facts

9  which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to

10  investigate material facts").[7]

11       If the presumption is not overcome, then the business judgment rule acts "as a substantive

12  rule of law, which will attach to protect the directors and the decisions they make."  Citron, 569

13  A.2d at 64.  Indeed, the business judgment rule acknowledges "that a board's decision, otherwise

14  properly based, could be wrong and still withstand attack.  And this is as it should be."  Reading Co.

15  v. Trailer Train Co., No. 7422, 1984 WL 8212, at *4 (Del. Ch. Mar. 15, 1984); see also Levine v.

16  Smith, 591 A.2d 194, 207 (Del. 1991) ("If a board's decision can be attributed to any rational

17  business purpose, . . . a court will not substitute its judgment for that of a board."); Gagliardi v.

18  TriFoods Int'l Inc., 683 A.2d 1049, 1053 (Del. Ch. 1996) (the business judgment rule shields

19  directors from liability for even "unwise," "foolish," or "stupid" decisions).  Accordingly, a

20  complaint's failure to overcome the presumption of the business judgment rule mandates its

21  dismissal.  See Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007) ("[T]o survive a Rule

22  12(b)(6) motion, a complaint alleging breach of fiduciary duty must plead facts supporting an

23  inference of breach, not simply a conclusion to that effect.").

24  [7]       In this case, Plaintiff could not possibly overcome the presumption of the business
   judgment rule by pleading a violation of the duty of care in light of HP's Certificate of
25  Incorporation exculpating HP's directors from monetary liability "[t]o the fullest extent permitted
   by the Delaware General Corporation Law . . . ."  (Horvath Decl. Ex. B, at X.A.)  This exculpation
26  extends to and precludes a claim for a breach of the duty of care.  See Lyondell Chem. Co. v. Ryan,
   970 A.2d 235, 239 (Del. 2009) (exculpatory charter provision protected directors "from personal
27  liability for breaches of the duty of care"); see also Ash v. McCall, No. Civ. A. 17132, 2000 WL
   1370341, at *10 (Del. Ch. Sept. 15, 2000) (exculpatory clause justified dismissing duty of care
28  claim).

1    **B.    The Decision To Set Executive Compensation Is Protected By The Business Judgment Rule.**

2

3         A decision by the board of directors to award compensation to a CEO is a quintessential

4    exercise of business judgment.  Indeed, the Delaware Supreme Court has held that "[i]f an

5    independent and informed board, acting in good faith, determines that the services of a particular

6    individual warrant large amounts of money, whether in the form of current salary or severance

7    provisions, the board has made a business judgment."  Grimes v. Donald, 673 A.2d 1207, 1215

8    (Del. 1996); see also White v. Panic, 783 A.2d 543, 554 n.35 (Del. 2001) ("White I") (a board has

9    "broad discretion" to set CEO compensation); Pirelli, 534 F.3d at 791 (plaintiffs failed to plead

10   facts that board of directors acted in bad faith in setting severance compensation for executives

11   even if board had arguable grounds to terminate executives for cause); 8 Del. C. § 122(5) ("Every

12   corporation created under this chapter shall have power to: . . . Appoint such officers and agents as

13   the business of the corporation requires and to pay or otherwise provide for them suitable

14   compensation.").  Accordingly, Plaintiff must plead particular facts establishing that the Director

15   Defendants did not act loyally and in good faith in setting Hurd's compensation.  Plaintiff has

16   failed to meet this pleading burden.

17        **1.    The Director Defendants had no personal interest in the setting of Hurd's compensation.**

18

19        Plaintiff has not pled facts showing that the Director Defendants breached their duty of

20   loyalty in approving Hurd's compensation.  The duty of loyalty "mandates that the best interest of

21   the corporation and its shareholders takes precedence over any interest possessed by a director,

22   officer or controlling shareholder and not shared by the stockholders generally."  Disney I, 907

23   A.2d at 751 (quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)).  Thus, the

24   duty of loyalty is implicated "when a fiduciary either appears on both sides of a transaction or

25   receives a personal benefit not shared by all shareholders."  Disney I, 907 A.2d at 751 (citing Cede,

26   634 A.2d at 361).

27        Here, Plaintiff has not pled any facts showing that the Director Defendants had a personal

28   interest in Hurd's compensation.  Plaintiff therefore has not rebutted the presumption that the

19

Director Defendants acted loyally to HP in setting Hurd's compensation.  See, e.g., Disney I, 907 A.2d at 751 ("The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders."); In re RJR Nabisco, Inc. S'holders Litig., Civ. No. 10389, 1989 WL 7036, at *14 (Del. Ch. Jan. 31, 1989) (finding no breach of the duty of loyalty where directors had no personal interest in the challenged transaction).

### 2.   Plaintiff has failed to rebut the presumption that the Director Defendants acted in good faith in setting Hurd's compensation.

Because there is no doubt that the Director Defendants were disinterested in setting Hurd's compensation, Plaintiff must make a "strong showing" that the Director Defendants failed to act in good faith.[8]  See In re Lear Corp. S'holder Litig., 967 A.2d 640, 653-654 (Del. Ch. 2008) ("[O]ur Supreme Court has held that to hold a disinterested director liable for a breach of the fiduciary duty of loyalty for acting in bad faith, a strong showing of misconduct must be made.") (citing In re Walt Disney Co. Deriv. Litig, 906 A.2d 27, 67 (Del. 2006) ("Disney II")).  To make such a strong showing, Plaintiff must plead facts demonstrating that the Director Defendants "knowingly and completely failed to undertake their responsibilities."  Lyondell Chem., 970 A.2d at 243-244; see also Disney II, 906 A.2d at 67 (a director acts in bad faith by, for example, "intentionally acting with a purpose other than that of advancing the best interests of the corporation, …  [or] intentionally fail[ing] to act in the face of a known duty to act, *demonstrating a conscious disregard for his duties*") (emphasis in original).

Not only does Plaintiff fail to plead facts showing that the Director Defendants acted improperly in setting Hurd's compensation, Plaintiff admits that Hurd's compensation in 2007, 2008 and 2009 was based on HP's "*superior financial results*, as well as *significant achievement on a broad range of non-financial goals, including strategic acquisitions, talent management and*

---

[8]      What is colloquially referred to as the "duty of good faith" does not establish an independent fiduciary duty and is actually "a subsidiary element, a condition, of the fundamental duty of loyalty."  See Stone, 911 A.2d at 369-370 (internal quotations and alterations in original omitted).  Accordingly, to comply with his or her duty of loyalty, a director must also act in the good faith belief that his or her "actions are in the corporation's best interest."  Id. at 370 (citation omitted).

1  succession planning." (Compl. ¶¶38-40) (emphasis added.) This is illustrated by HP's growth in

2  employees, net revenue, net earnings and market valuation. See above at 5:19-27.

3        Plaintiff ignores these results and attempts to argue that the Director Defendants should not

4  have compensated Hurd so highly because they allegedly knew, based on the allegations in the

5  Rille Actions, that Hurd made a "conscious decision to allow HP employees to violate" the False

6  Claims Act, the Anti-Kickbacks Act and the FCPA. (Compl. ¶¶83 & 109(a).) But this argument

7  misses the mark for two reasons. First, the reference to Hurd in the Rille Actions concerned

8  actions by Hurd when he was at vice-president in marketing at NCR Corporation, not when he was

9  at HP. (Id. ¶83.) Second, even if the allegation in the Rille Actions about messages Hurd sent

10 while at NCR raised a cloud as to his potential liability, that does not in any way diminish that the

11 Court's "deference to directors' business judgment is particularly broad in matters of executive

12 compensation." White v. Panic, 793 A.2d 356, 369 (Del. Ch. 2000) ("White II"), aff'd, 783 A.2d

13 543, 553 (Del. 2001) (citation omitted). In White v. Panic, the plaintiff challenged the decision by

14 the board of directors of ICN Pharmaceuticals to award Milan Panic, ICN's CEO, a $1.8 million

15 bonus at the same time Panic and ICN faced liability for Panic's alleged sexual harassment of

16 ICN's employees. White II, 793 A.2d at 360-62. The plaintiff in White alleged that this bonus

17 condoned and encouraged Panic's misconduct. Id. at 363. The Chancery Court rejected this

18 allegation, holding that absent an allegation of actual fraud in the award of Panic's bonus, the

19 business judgment rule precluded the court from second-guessing the broad discretion of the board

20 of ICN to set Panic's compensation. Id. at 369. The same result follows here, and the Court

21 should dismiss the claims regarding Hurd's compensation in Count I.

22 **IV.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS MERITLESS.**

23        Plaintiff asserts that the Director Defendants were unjustly enriched due to the

24 compensation they received for their services as directors of HP while they allegedly breached their

25 fiduciary duties. (See Compl. ¶¶12, 13 & 118-119.) This claim fails in the first instance because,

26 for the reasons discussed above, Plaintiff has not pled facts showing the Director Defendants

27 breached their fiduciary duties to HP. This claim fails for the additional reason that Plaintiff has

28 not properly alleged an unjust enrichment claim.

21

1    To adequately plead a claim for unjust enrichment under Delaware law, Plaintiff's

2    Complaint must allege facts showing: "(1) an enrichment, (2) an impoverishment, (3) a relation

3    between the enrichment and the impoverishment, (4) the absence of justification, and (5) the

4    absence of a remedy provided by law." Accuray, 757 F. Supp. 2d at 935; see also Sherman v.

5    Ryan, 911 N.E.2d 378, 399 (Ill. App. Ct. 2009) (same); Total Care Physicians, P.A. v. O'Hara, No.

6    Civ. A. 99C-11-201-JRS, 2002 WL 31667901, at *10 (Del. Super. Ct. Oct. 29, 2002) (same).

7    Rather than allege any *facts* showing each of these five elements, the Complaint insufficiently

8    alleges "[b]y their wrongful acts and omissions, the Director Defendants were unjustly enriched at

9    the expense of and to the detriment of HP." (Compl. ¶118.)

10    Sherman is instructive.  There, Patrick Ryan and Michael O'Halleran, two members of the

11   board of directors of Aon Corporation, allegedly engaged in securities fraud on behalf of Aon and

12   were unjustly enriched by the "'profits, benefits, and other compensation' they obtained from their

13   wrongful conduct." Sherman, 911 N.E.2d at 399 (citation omitted).  The court held that this bald

14   allegation was insufficient to state a claim for unjust enrichment where the complaint did not allege,

15   "even in a conclusory fashion, the absence of justification and the absence of a remedy provided by

16   law, two essential elements of a claim for unjust enrichment." Id.  Although plaintiffs claimed that

17   Ryan and O'Halleran were unjustly "paid substantial salaries and bonuses while Aon engaged in

18   conduct that caused it to sustain more than $228 million in settlements," plaintiffs failed to allege

19   that "Ryan and O'Halleran *performed no work in exchange for their compensation*." Id. (emphasis

20   added).  Accordingly, plaintiffs failed to allege an unjust enrichment claim. Id.; see also Accuray,

21   757 F. Supp. 2d at 935-936 (dismissing unjust enrichment claim that was predicated on the

22   conclusory allegation that the directors of Accuray were "'unjustly enriched *as a result of the*

23   *compensation and director remuneration they received while breaching fiduciary duties owed to*

24   *Accuray*'") (emphasis added and citation omitted).

25    The same result follows here.  Plaintiff does not allege that the Director Defendants failed

26   to perform any work in connection with their service on the HP Board.  Moreover, the Complaint

27   does not allege that the Director Defendants directly profited from the alleged payment of bribes or

28   kickbacks by a handful of HP employees.  Plaintiff has not pled an unjust enrichment claim.

1    Plaintiff's unjust enrichment claim also fails because HP was contractually obligated to

2  compensate the Director Defendants.  (See, e.g., Horvath Decl. Ex. A, at 21 (describing annual

3  compensation that each outside director "was entitled to receive" for his or her board service).)

4  Those contractual obligations negate any unjust enrichment claim.  See Nemec v. Shrader, Civil

5  Action Nos. 3878-CC, 3934-CC, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) (dismissing

6  unjust enrichment claim because "Delaware courts . . . have consistently refused to permit a claim

7  for unjust enrichment when the alleged wrong arises from a relationship governed by contract");

8  see also Wood v. Coastal States Gas Corp., 401 A.2d 932, 942 (Del. 1979) (affirming dismissal of

9  unjust enrichment claim where there was a contract governing the parties' relationship and holding

10  that "there can be no recovery under an unjust enrichment theory independent of [the contract]").

11  **V.    THE DIRECTOR DEFENDANTS JOIN IN HP'S MOTION TO DISMISS.**

12    The Director Defendants join in the arguments made by nominal defendant HP in support

13  of its motion to dismiss this action pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of

14  Civil Procedure for Plaintiff's failure to make a demand on the HP Board before commencing this

15  shareholder derivative action or to plead with particularity sufficient reasons to excuse demand.

16                              **CONCLUSION**

17    For all the reasons set forth above, this Court should dismiss this action against the Director

18  Defendants with prejudice.

19  DATED:  August 15, 2011

20                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21

22                              By: _____/s/ James E. Lyons_____
                                              JAMES E. LYONS
                                          Attorneys for Defendants
23                              MARC L. ANDREESSEN, LAWRENCE T. BABBIO,
                                      SARI M. BALDAUF, RAJIV L. GUPTA,
24                              JOHN H. HAMMERGREN, JOEL Z. HYATT,
                                JOHN R. JOYCE, ROBERT L. RYAN, LUCILLE S.
25                                 SALHANY and G. KENNEDY THOMPSON

26

27

28

                                      23